RUDOLPH M. MARIS, [1] Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent Maris v. Commissioner
Docket Nos. 10404-78, 10405-78, 10406-78, 10408-78.
United States Tax Court
T.C. Memo 1980-444; 1980 Tax Ct. Memo LEXIS 141; 41 T.C.M. (CCH) 127; T.C.M. (RIA) 80444; October 2, 1980, Filed Kenneth G. Anderson and Thomas M. Donahoo for the petitioners. Stuart B. Kalb, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: In these consolidated cases respondent determined deficiencies in Federal gift taxes as follows: Calender Quarters
Petitioner
December 31, 1974
June 30, 1975
Rudolph M. Maris
$14,018
$10,008
Constance E. Maris
14,018
10,008
Roger E. Maris
14,018
10,008
Patricia A. Maris
14,018
10,008
The only issue presented for decision is the fair market value of the common stock of Maris Distributing Company *142 transferred to petitioners' children on December 23, 1974 and May 12, 1975, respectively. FINDINGS OF FACT Some of the facts have been stipulated. All of the stipulations of facts and accompanying exhibits are incorporated herein by this reference. Petitioners resided in Gainesville, Florida at the time their petitions were filed in these cases. Rudolph M. Maris and Constance E. Maris and Roger E. Maris and Patricia A. Maris, respectively, were husbands and wives. Timely Federal gift tax returns were filed by petitioners with the Director, Internal Revenue Service Center, Chamblee, Georgia for the calendar quarters ending December 31, 1974 and June 30, 1975. Constance E. Maris and Patricia A. Maris consented to have the gifts reported by their husbands as having been made on-half by each spouse. On December 23, 1974 and May 12, 1975 Rudolph M. Maris and Roger E. Maris made gifts to each of their respective children of shares of common capital stock in Maris Distributing Company (hereinafter MDC) as follows: Rudolph M. Maris
December 23, 1974
May 12, 1975
Number of Shares
Burt Maris
9
3
Bart Maris
9
3
Mike Maris
9
3
Brad Maris
9
3
Roger E. Maris
Roger Maris, Jr.
9
3
Kevin Maris
9
3
Randy Maris
9
3
Richard Maris
9
3
*143 The birthdates of the children of Rudolph and Roger Maris are: Rudolph Maris
Birthdate
Burt Maris
April 5, 1963
Bart Maris
April 5, 1963
Mike Maris
September 27, 1964
Brad Maris
February 21, 1967
Roger Maris, Jr.
November 13, 1958
Kevin Maris
August 29, 1960
Randy Maris
August 21, 1961
Richard Maris
November 12, 1963
Petitioners reported the value of the MDC shares as $2,318 per share on the dates of the gifts. In his statutory notices of deficiencies the respondent determined that the fair market values of the MDC shares were $7,475 per share on December 23, 1974 and $9,566 per share on May 12, 1975. Petitioners' expert witness gave his opinion that the value of the shares were $1,925 and $2,125 on December 23, 1974 and May 12, 1975, respectively. Respondent's expert witness gave his opinion that the value of the shares were $7,490 on December 23, 1974 and $7,466 on May 12, 1975. MDC is a corporation organized under the laws of the State of Florida. It was incorporated on November 2, 1967. Its only class of capital stock is common stock. Five thousand shares were authorized, of which five hundred are outstanding. From the date of incorporation *144 until the gifts described above were made, Rudolph M. Maris and Roger E. Maris each held 250 shares. The shareholders of MDC and the number of shares held before and after the gifts were: Prior
After gifts on
After gifts on
Stockholder
to gifts
December 23, 1974
May 12, 1975
Rudolph M. Maris
250
214
202
Roger E. Maris
250
214
202
Burt Maris
9
12
Bart Maris
9
12
Mike Maris
9
12
Brad Maris
9
12
Roger Maris, Jr.
9
12
Kevin Maris
9
12
Randy Maris
9
12
Richard Maris
9
12
Each share of MDC common stock was entitled to a single vote on matters brought before the stockholders. As minority blocks, the shares gifted in 1974 and 1975, both separately and in the aggregate, did not have sufficient voting power to have any control over the business of MDC, the payment of dividends, the election of directors, or other corporate transactions or policies. MDC was organized to acquire a wholesale distributorship for Budweiser, Busch-Bavarian and Michelob beer products manufactured by Busch. In January, 1968, MDC acquired the existing assets of A.P. Inc., the prior Busch distributor in the Gainesville-Ocala market region. *145 MDC paid A.P. Inc. $23,104.36 and assumed an existing mortgage of $34,936.33 for A.P.'s assets. The price paid by MDC was equal to the adjusted book value of the assets. MDC purchased the existing inventory of Busch products from Busch and also entered into a distributorship agreement with Busch. In 1974 and 1975, MDC operated under an Anheuser-Busch wholesalers agreement (hereinafter Equity Agreement) entered into April 1, 1974. Under the Equity Agreement, MDC agreed to purchase Busch malt beverages, to distribute them to retailers in its sales area, and to provide the necessary servicing of retail accounts. The sales area was nonexclusive. MDC's primary area of responsibility (sales area) under the Equity Agreement was the nine central Florida countries of Alachua, Gilchrist, Dixie, Levy, Marion, Putnam, Citrus, Sumter and Hernando. The principal cities in the sales area were Gaineville and Ocala. The population of the sales area increased from 274,620 persons in 1970 to 369,700 persons by 1975. The entire Florida population in 1974 was 8,092,000. The sales area served by MDC has a warm climate and is a prime area for beer consumption. During the taxable years 1973 *146 through 1975 MDC sold Busch products as follows: Taxable Year Ended
Cases
Half-Kegs
Total Cases
September 30, 1973
1,540,843
16,303
1,654,964
September 30, 1974
1,737,109
19,325
1,872,384
September 30, 1975
1,729,905
18,686
1,860,707
During the same calendar years the total amount of Busch products sold in Florida were as follows: Calendar Year Ended
Cases
Half-Kegs
Total Cases
December 31, 1973
15,390,975
299,034
17,484,213
December 31, 1974
17,812,375
294,460
19,873,595
December 31, 1975
17,638,723
281,086
19,606,325
Since its inception MDC has maintained warehouse facilities in Gainesville and Ocala. In 1971, a new warehouse was built in Gainesville. It was enlarged in 1975. In 1974, construction of a new facility in Ocala was begun but due to construction delays the utilization of the new facility was not possible until 1976. MDC primarily purchased its Busch inventory from a Busch plant in Jacksonville and distributed the product by use of route trucks throughout the sales area. Most of MDC's customers are supermarkets, convenience stores, package stores, bars and restaurants. The MDC product line *147 is sold by the case and in half-keg sizes. The business of MDC is regulated by the State of Florida and the Alcohol and Tobacco Tax Division of the Internal Revenue Service. The management of MDC is shared by petitioners Rudolph and Roger Maris. The Equity Agreement provides, in relevant part, as follows: 2. PERSONAL SERVICE AGREEMENT: The sale of malt beverages requires highly personalized promotion and sales service efforts. Anheuser-Busch relies upon the personal efforts and capabilities of the principal manager of Wholesaler's operation to aggressively promote, sell and service Anheuser-Busch's Products. The business of selling malt beverages at wholesale has generally proved to be more successful when the principal manager of such business has at least some ownership interest. The parties therefore agree that this is a personal service contract and is entered into by Anheuser-Busch with Wholesaler in reliance upon and in consideration of the personal qualifications of the person identified below (such person being hereinafter referred to as 'Manager') who will principally manage the business of Wholesaler: (Insert name of manager) Rudolph M. Maris / Manager Under *148 the Equity Agreement Roger E. Maris was the successor-manager. Rudolph M. Maris was the person primarily responsible for the management of MDC, demonstrating a high degree of skill in the conduct of its business. He has a degree in mechanical engineering. He spent three years in management training with Allis-Chalmers Manufacturing Company, and between four and five years managing a trailer manufacturing company in the state of Ohio. His management experience also included a year and a half as his brother's business manager. He joined MDC as Secretary-Treasurer in 1968, and he served continuously in that capacity through the years 1974 and 1975. He was well-experienced in management matters when he joined MDC. As MDC's principal business manager, he developed internal procedures which achieved substantial cost savings. The background of Roger E. Maris prior to joining MDC was professional baseball. In 1953 he joined the Cleveland baseball organization where he played until 1958. He then spent two years with the Kansas City Athletics. In 1960 he joined the New York Yankees where he played until 1966. He played for the St. Louis Cardinals for the 1967 and 1968 seasons. *149 During his professional baseball career Roger Maris, among many other achievements, hit 61 home runs in the 1961 season, surpassing Babe Ruth's long standing record. He was named the Most Valuable Player in the American League in 1960 and 1961. By virtue of his outstanding professional baseball career he became a national sports figure. After moving to Gainesville in 1968 he continued to attract interest from news organizations. He participated in sporting events such as golf tournaments sponsored by Busch. In this continuing news coverage, his sports background continued to be identified with MDC and Busch. He was in charge of sales and public relations for MDC. He was the primary sales contact and public relations man for MDC, calling on all accounts and working to obtain point of sale emphasis for the products sold by MDC, as well as handling customer relations. Because of his attainments in sports, and his premier national status and fame as a sports figure, Roger E. Maris was able to establish a unique personal rapport with purchasing agents for convenience stores and supermarkets, which contributed to the success of MDC. He was able to rely upon his unique personal *150 attributes to develop and retain such business for MDC. The Equity Agreement provides various rules for the transfer of MDC control to individuals other than the persons designated as the owners in the agreement or for naming a successor manager (who did not have to be an owner) of the distributorship. The Equity Agreement does not permit transfer of MDC control without prior approval by Busch. If the procedures for obtaining Busch's prior approval are not followed, Busch is entitled to terminate the Equity Agreement and is only required to purchase the MDC warehouse inventory at cost. The Equity agreement also provides in this regard that: 4. OWNERSHIP OF WHOLESALER: (e) Under no circumstance shall Wholesaler or any owner of Wholesaler have the right to sell the business of Wholesaler or any ownership interest therein if such sale would result in Wholesaler being owned in whole or in part, directly or indirectly, by the public. For the purpose of this Agreement, ownership "by the public" shall be deemed to include any situation in which any securities of Wholesaler, or of a corporation which, directly or indirectly, has an ownership interest in the Wholesaler, are traded *151 in the open market, or sold over-the-counter or on any stock exchange. (f) Notwithstanding any other provision contained in this paragraph 4, no approval of Anheuser-Busch shall be required for any transfer of ownership to (heirs) or (legatees) of an owner of Wholesaler even though such transfer may result in a change in control, provided, however, that subsequent transfers of such ownership interests by such (heirs) or (legatees) shall thereafter be subject in all respects to the provisions of this Agreement, including without limitation, the provisions of this paragraph 4. With respect to the naming of a successor-manager, the Equity Agreement provides detailed and lengthy procedures that must be followed. If Busch and MDC are unable to agree on a successor-manager, MDC must sell the business in 90 days and failure to do so will terminate the Agreement. If the Agreement is terminated, Busch is required to purchase the inventory and business assets at book value and to pay MDC an amount equal to three times the most recent year's after-tax earnings. The Equity Agreement defines after tax earnings as: the proceeds realized from the sale of Anheuser-Busch Products during Wholesaler's *152 most recently completed fiscal year, less all direct and indirect costs and expenses (including depreciation computed on a straight-line basis and including taxes on income but excluding non-recurring or extraordinary charges or credits) incurred in the purchase, storage, sale and delivery of such Products. After-tax net income shall be determined in accordance with generally accepted accounting principles and practices. Busch is entitled to terminate the Equity Agreement with MDC if MDC fails to follow Busch's sales and merchandising standards of conduct of the wholesale business and such deficiencies are not corrected during a correction period. The Equity Agreement also provides in pertinent part: 5. DEFICIENCY TERMINATION: For many years Anheuser-Busch and its wholesalers have successfully used certain sales and merchandising methods and observed certain standards which have been carefully developed to preserve the quality image of Anheuser-Busch Products and to produce maximum sales for its wholesalers not only for the present but also for the future. The parties agree that failure to use or observe one or more of these methods or standards could result in the deterioration *153 of Wholesaler's market position even though its current sales may be good. These sales and merchandising methods and operating standards are well known to Anheuser-Busch wholesalers, but to eliminate any uncertainty, they are set forth in detail in Exhibit 5 attached to this Agreement. The mere fact, however, that a wholesaler's current sales record is favorable does not necessarily mean that its operation is without deficiencies; conversely, the mere fact that a wholesaler's current sales record is unfavorable does not necessarily mean that its operation is deficient. If Wholesaler should fail to use or observe one or more of the sales and merchandising methods and standards set forth in Exhibit 5 in a manner and to the extent consistent with the type of market which is Wholesaler's primary market area, Anheuser-Busch shall have the right to terminate this Agreement (which termination is herein referred to as a "deficiency-termination") subject, however, to the termination procedures hereinafter set forth: * * * In the event of a deficiency termination, Busch is required to purchase inventory at cost, purchase the business assets if MDC desires to sell them and pay an amount *154 equal to three times the most recent year's after-tax earnings. Busch may also terminate the Equity Agreement without resort to the deficiency procedures if, among other things, MDC goes bankrupt, becomes insolvent, or MDC or any owner is convicted of a felony which in Busch's opinion may adversely affect good will. In such a situation Busch is only required to purchase the inventory. The following schedule shows the sales and profit position of MDC for its fiscal years ended September 30, 1970 through September 30, 1974: Profit and Loss Statement
9/30/74
9/30/73
9/30/72
9/30/71
9/30/70
Sales
$9,283,696
$7,446,717
$6,287,236
$5,405,686
$4,598,442
Cost of Sales
7,597,376
6,461,053
5,442,238
4,667,524
3,921,788
Gross Profit
1,686,320
985,664
844,998
738,162
676,654
Other Income
69,662
187,872
124,680
101,718
58,656
Total Income
1,755,982
1,173,536
969,678
839,880
735,310
Total Deductions
1,052,623
865,790
687,972
579,879
489,863
Taxable Income
703,359
307,746
281,706
260,001
245,447
Income Tax
328,591
139,427
126,162
118,300
116,880
Total Income
After Tax
$ 374,768
$ 168,319
$ 155,544
$ 141,701
$ 128,567
*155 The after tax earnings per share of MDC during the fiscal years 1969 to 1974 were as follows: Earnings
TYE
Per Share
1969
$189.55
1970
257.13
1971
283.40
1972
311.09
1973
336.64
1974
749.54
For the five years ended September 30, 1970 through September 30, 1974, MDC's average annual net income after taxes was $193,780; an average per share of $387.56. The following table shows the percentage increase in sales for the period September 30, 1970 to September 30, 1974: Percent Increase
Year
Sales
from Prior Year
1970
$4,598,442
1971
5,405,686
17.6%
1972
6,287,236
16.3%
1973
7,446,717
18.4%
1974
9,283,696
24.7%
The following table indicates the profit margins as a percentage of sales for the period September 30, 1970 to September 30, 1974: Profit Margin as
Year
Percentage of Sales
1970
2.8
1971
2.6
1972
2.5
1973
2.3
1974
4.0
The following table indicates the percentage increase in profits on an annual basis for the period September 30, 1970 to September 30, 1974: Percentage Increase
Year
Profits
From Prior Year
1970
$128,567
1971
141,701
10.2%
1972
155,544
9.8%
1973
168,319
8.2%
1974
374,768
122.6%
*156 From the period 1969 to 1974, the following table indicates the annual return on equity per share: Average Book Value
Year
EPS
Per Share
R.O.E.
1969
$189.55
$ 382
50%
1970
257.13
639
40%
1971
283.40
923
31%
1972
311.09
1,234
25%
1973
336.64
1,570
21%
1974
749.54
2,318
32%
In 1974 MDC was permitted to raise its retail price on its products for the first time in six years to offset increased wholesale beer costs. The increased retail prices, as applied to existing inventories of beer purchased prior to the wholesale price increase, resulted in a non-recurring additional profit on its inventory in the amount of $59,500. During 1974 MDC embarked on a $295,300 capital improvement program. Among the major items purchased were six new route trucks and a warehouse addition at their Gainesville location. In addition, MDC was informed during 1974 that Busch was comtemplating requiring its distributors to refrigerate their warehouses. Such refrigeration would permit Busch distributors to carry larger amounts of inventory for a longer period of time. In September 1974, the Florida Supreme Court held invalid a Florida statute which *157 prohibited credit sales of beer products. MDC had nominal trade accounts receivable prior to that time, making essentially all of its sales for cash. Because of the Florida Supreme Court decision, MDC anticipated that its primary competitor would offer credit sales, and that MDC would be required for competitive reasons to do likewise. If this developed, MDC estimated that it might have to carry $500,000 in accounts receivable for a three-week receivable cycle. Added costs in office equipment and personnel to handle an accounts receivable system were also contemplated. MDC was also concerned about the potential of a returnable container law being passed by the Florida legislature. At that time a number of states had adopted similar legislation and great concern existed in the beverage industry that Florida would follow suit. In 1974 an extensive program of price promotions, previously conducted on a joint basis by Busch and MDC, was virtually eliminated. In prior years MDC would engage in price reductions on the retail level and be reimbursed by Busch for one-half of the price reduction. In 1971, 1972 and 1973 the amounts of reimbursement from Busch were $55,452, $78,500 *158 and $131,579, respectively.In 1974 Busch and MDC discontinued this program. At the same time Busch dramatically increased its expenditures for national advertising. For example, Busch increased advertising expenditures in 1974 by 35 percent over 1973, i.e., from $9,000,000 to $12,900,000. MDC benefited from this upward advertising trend. The impact of the elimination of price promotions upon MDC's gross revenues, profit margins and net profits is uncertain. In the fiscal year 1975 MDC elected to become a subchapter-S corporation. For the fiscal year ended September 30, 1975, MDC had pre-tax earnings of $582,167 and earnings per share of $1,164.33. Applying a 46 percent corporate tax rate to the earnings and earnings per share figure (average tax rate which MDC paid in 1973 and 1974), MDC's 1975 after tax earnings were $314,370 and its earnings per share were $628.74. For the six month period ended March 31, 1975, the sales and income of MDC before tax were $4,502,272 and $269,779, respectively. During 1975 MDC dramatically increased its compensation levels to Rudolph and Roger Maris. In 1974 each was paid $104,000. In 1975 MDC paid each of them $260,000. When the first *159 gifts were made in December 1974 the United States economy was in a severe recession. Industrial production had declined sharply. December 1974 marked a twenty year low point in the public market for listed stocks. The average price-earnings ratio had declined to 7.7 times earnings at the end of 1974, down from 11.9 times earnings in 1973. A similar downward trend was evident in the brewing industry. Publicly held brewing stocks of the industry leaders had declined sharply from 1972 and 1973 levels to reach lows in late 1974. Their stock market price highs and lows for the years 1971 through 1975 were as follows: High and Low Common Stock Prices of Leading U.S. Brewers 1971-1975
1971
1972
1973
1974
12/31/74
1975
Anheuser-Busch
57-24
69-51
35-28
38-21
24
39-24
Schlitz 36-22
63-34
68-49
57-13
15
30-15
Pabst
75-45
101-71
75-19
24-11
13
32-16
Olympia
33-22
28-17
19-11
17-7
9
25-9
Heileman
28-13
21-11
14-8
10-5
6
13-6
The average price-earnings ratios for the four largest brewing companies (Busch, Phillip Morris, Schlitz and Pabst) during 1974 were 16 to 1. The average price-earnings ratio for Busch *160 was 21 to 1 in 1974.
The following table reflects the high and low price-earnings ratios of selected major United States brewers during 1972, 1973 and 1974: 1972
1973
1974
Brewer
High
Low
High
Low
High
Low Busch
41
30
38
20
27
15
Pabst
34
24
30
8
12
5
Schlitz
40
22
36
26
34
8
Olympia
17
11
12
7
22
9
Heileman
14
8
9
5
7
5
The lowest price at which Busch stock was sold during 1974 and 1975 was 15 and 13 times earnings, respectively. The lowest composite price-earnings ratio for the corporations comprising the Brewery Industry Index (Standard & Poor's) was 9 times earnings in 1974. The lowest price-earnings ratio for the corporations comprising the Distilling Industry Index (Standard & Poor's) was 8 times earnings in 1974. The stock prices of corporations comprising the Brewing Industry Index (Standard & Poor's) during 1974 at its low point were 29 percent higher than the Standard & Poor's Industrials at its high point during 1974 the Brewing Industry Index was 185 percent higher than the Standard & Poor's Industrials. During 1974 and 1975 the price-earnings ratios of soft drink manufacturing *161 companies, whose stock was traded publicly, were generally higher than the price-earnings ratios of soft drink distributing companies whose stock was traded publicly. Petitioners' Federal gift tax returns were prepared by their certified public accountant, Frank J. Miles (Miles), who has handled Federal estate and gift tax matters for over 25 years. Miles was a principal in the Gainesville accounting firm which had handled accounting and income tax matters for MDC since 1968. He was personally familiar with the business of MDC and its principals. He had handled various assignments for the brewing industry since 1959. Miles had represented other Busch wholesalers in Florida, including MDC's predecessor, A.P., Inc. Miles valued the shares of MDC given by petitioners at $2,318 per share on the dates of gift, an amount equal to the book value for such shares on September 30, 1974. In establishing such valuation Miles took into account the following factors: (1) the assets and business acquired by MDC in 1968 were purchased at book value; (2) the history of MDC; (3) its sales and assets; (4) the minority interests involved; (5) trends and problems in the brewing industry; (6) *162 the nature of MDC's business; (7) MDC's management and the personal contributions made by Roger and Rudolph Maris to the business, the absence of advertising allowances in 1974, the price increases and the inventory gain realized by MDC, and potential refrigeration cost requirements proposed by Busch; and (8) the restrictions under the equity agreement on sale of MDC shares and the average earnings of MDC in the five years ended September 30, 1974. In determining the value of the MDC shares he capitalized five years average earnings at six times earnings. The average earnings so calculated were less than book value. Taking all the above factors into account, Miles valued the MDC shares on December 23, 1974 and May 12, 1975 at $2,318 per share, or their book value. Subsequently, petitioner retained Philip W. Moore (Moore) to prepare a valuation report on the gifted shares of MDC. Moore graduated Phi Beta Kappa from Princeton University in 1942. He received a Master's Degree in Corporate Finance from the New York University Graduate School of Business Administration in 1950. From 1946 to 1950 he was a securities analyst and venture capital specialist with The First Boston Corporation *163 in New York and with Schroeder, Rockefeller & Co. In 1950 he founded First Research Company, Coral Gables, Florida. He was President of First Research from 1950 to 1967. From 1967 to 1971 he was Vice President of The First Boston Corporation. From 1971 to the date of trial he was Chairman of First Research Company, Coral Gables. Both The First Boston Corporation and Schroeder, Rockefeller & Co. were investment banking firms in New York City. His duties with First Research and First Boston involved valuation studies, market and economic analyses of corporations throughout the United States.First Research Company has prepared between 4,500 and 5,000 such reports in its thirty year history. The staff of First Research Company included 20 persons, of whom 12 were professionals. Moore has testified as an expert witness on stock valuation cases before the United States Tax Court and the United States District Court, and he has been retained by taxpayers, the office of District Counsel, Internal Revenue Service, and the Department of Justice. Moore prepared a valuation report on the common shares of MDC. It was his opinion that the fair market values of the MDC common shares *164 given by petitioners were as follows: December 23, 1974
May 12, 1975
Fair market value
of the MDC shares,
per share
$1,925
$2,125
Moore reviewed the financial statement and company records pertaining to the operation, management and ownership of MDC. Background information was reviewed as well as financial and economic statistics; data on security values, as presented by leading financial journals; the conditions in the economy and the brewing industry. Moore considered the economic climate in the years 1974, 1975 and prior; the current investment and economic situation; the situation within the industry, business and sales area within which MDC functioned. In valuing MDC shares, he reviewed its earnings and profit and loss statements, its balance sheets, its management, capitalization, its product line, the character of its organization, and sales and business operations. Moore made a personal inspection of the premises of MDC, and personally interviewed the accountant and officers of MDC in reaching his conclusions of value. Moore considered Revenue Ruling 59-60 as a general outline, reviewed publications pertinent to the brewing industry *165 and brewing distribution, studied money rate movements, the impact of the 1974 recession, the equity agreement, the minority interest to be valued and other pertinent factors relating to the fair market value of the MDC shares. He further considered the specific finances of MDC, its sales and profit pattersn, its book value, dividend paying capacity, operational results of other similar enterprises, whether there were comparable companies, and industry and market outlook. It was Moore's opinion that, given the small minority interest represented by the MDC shares, there would be a very narrow market, or small number of prospective purchasers for such shares. Moore also considered the alternate investment opportunities available to an investor about the dates of gift, such as United States Treasury securities and other securities and stocks which were readily marketable. In valuing the stock of MDC, Moore analyzed the issues of publicly traded securities to determine whether or not he might locate securities of a comparable company. He concluded that none of such comanies were comparable to MDC. Having found no comparable companies, Moore based his appraisal upon the *166 above factors, and the intrinsic factors relevant to MDC, including capitalization of after-tax earnings and stockholder equity, dividend yield, dividend paying capacity and book value. With respect to capitalization of earnings, Moore concluded that a knowledgeable investor would project future after-tax earnings of $500 per share, or annual after-tax earnings of $250,000. This figure was arrived at by studying the earnings of MDC since its inception, and through September 30, 1974 for the gifts made on December 23, 1974 and through the six months ended March 31, 1975 for the gifts made on May 12, 1975. In his projection of future earnings Moore took into account the earnings trend and weighed past earnings. He averaged earnings for the four years 1970 to 1973 at $296 per share; the five years 1970-1974 at $388 per share; actual earnings for 1972 and 1973 and the $749 per share earnings for 1974; and an estimate of $600 per share earnings for 1975. From the foregoing, he reached an overall average of $498 per share, which he rounded to $500. In reaching this figure he considered the prior annual growth in sales. Moore believed that inventory gains, price increases, and the *167 price promotion policies of Busch had caused the 1974 earnings to be unusually large. Moore used an earnings multiple of 6 times earnings. This earnings multiple was selected taking into account earnings of public companies, some of which in the Florida economy were well under 6, declining earnings multiples in public companies, the Dow Jones average which was 6 times earnings on December 24, 1974; the Barron's 50 stock index which was 5.8 times earnings on December 23, 1974; the Standard & Poor's average which was 7.7 for the third quarter of 1974; multiples of food wholesaling companies, which ran from 3 to 7 and averaged 6 1/2; and the adverse trend in price earnings multiples and risk. Using these projected earnings and an earnings multiple of 6, Moore arrived at a preliminary determination of value based on capitalization of earnings of $3,000 per share for the MDC shares as of December 23, 1974. Moore considered MDC's book value and the progression of the increase in book value since 1970. He found that corporate assets had values fairly reflected by the financial statements. He found that the shares of some public brewing companies were falling below book value, and *168 in many instances in the public market, public company shares were selling at a discount of between 10 and 50 percent of book value. In analyzing MDC's capital position and dividend paying capacity, Moore considered the substantial increases in capital requirements to carry inventory, purchase automotive equipment, the capital requirements of the new Ocala warehouse, those specific caital requirements outlines in MDC's minutes of September, 1974, the possible need to carry large accounts receiveable due to the invalidation of the "cash" law, and the direction of the manufacturer to require refrigerated warehouse space. With respect to dividend yield and dividend paying capacity, Moore fund no record of actual dividends and, at the time of the gifts, no determination to pay dividends. He noted the increase in inventory and the other needs for capital, which he felt an investor would consider, in evaluating dividend paying capacity. In his opinion the dividend paying capacity was between 25 and 50 percent of average earnings for 1972 to 1974, which he concluded would result in a per share valuation based on dividend paying capacity of $2,500 per share. Considering dividend paying *169 capacity at $2,500 per share, book value of $2,318 per share, and earnings at $3,000 per share, Moore then reached a preliminary determination of value of $2,750 per share on December 23, 1974. Considering the lack of marketability and minority interests involved, Moore concluded that a range of 30 percent to 50 percent discount was justified. He applied a 30 percent discount for these reasons to the $2,750 preliminary determination of value. Moore's opinion of fair market value on December 23, 1974 of the MDC shares was $1,925 ($2,750 less 30 percent). For the gifts of MDC shares made on May 12, 1975, Moore reached an opinion of value of $2,125 per share. In reaching this conclusion, Mr. Moore took into account the factors mentioned above, and, in addition, gave weight to the results of the first six months of MDC's operation for fiscal 1975, the spring rally in the stock market, and the increase in book value to $2,566 by March 31, 1975. Respondent's valuation expert, Dr. Arthur T. Dietz (Dietz) is presently a professor of Business Administration in Finance and Banking at Emory University. Dietz graduated Phi Beta Kappa from Wesleyan University in 1946 with a B.A. in economics. *170 His masters and doctorate degrees in economics and finance were obtained from Princeton University.Dietz has taught at Emory University since 1954, is Chairman of the Finance Department and served as Director of the MBA program from 1959 to 1979. Dietz teaches courses in financial management, investment analysis, and security analysis. He has been a financial consultant to manufacturing firms, investment firms, banks, and small businesses. He has written articles on capital budgeting, conducted executive training seminars, serves on the board of directors for a number of funds and corporations and has testified in a wide variety of valuation cases; including the valuation of stock of closely-held businesses. He has testified in both state and Federal courts and has testified before the United States Tax Court four times. Dietz offered two methods of valuation of the MDC stock in his report. His preferred method was denominated the "wholesaler valuation methodology", an approach which he believes is the mechanism commonly employed by the industry to value a beer distributorship. Under this method the selling price per share of MDC would be equal to be annual number of cases *171 of beer sold per share multiplied by an appropriate dollar multiple. Dietz observed that since 1974 the dollar multiple applied in the distributorship trade has been $1.00 to $1.50 per case, but distributors of dominant brewery products ordinarily sell between multiples of $2 to $3. Reviewing the earnings growth of MDC, its increasing sales, its performance during the recessionary period of 1974 and 1975, its return on equity, the general operations of the business, and its market, Dietz chose $2 as the appropriate multiple. MDC sold 3,745 cases per share in fiscal 1974 and 3,721 cases per share in fiscal 1975. Using the $2 multiple and averaging the fiscal 1974 and 1975 cases per share figures to arrive at an appropriate case per share amount for a one year period (April 1, 1974 to March 31, 1975) prior to May 12, 1975, Dietz determined the following valuations: MDC Shares Gifted on
December 23, 1974
$7,490
MDC Shares Gifted on
May 12, 1975
7,466
Dietz also valued the MDC shares by using an earnings approach. Unlike petitioners' expert Moor, Dietz did not average earnings over a five year period to obtain the appropriate earnings per share figure. Rather, *172 he took the earnings per share amount for the fiscal year 1974 (October 1, 1973 to September 30, 1974) for the MDC stock gifted on December 23, 1974. For the MDC stock gifted on May 12, 1975, Dietz determined an earnings per share figure for the period from April 1, 1974 to March 31, 1975 by averaging the earnings per share figures for fiscal 1974 and 1975. [2] Dietz did not average the earnings over a five year period because in his view the company had experienced continued, noncylical growth. He did not adjust the fiscal 1974 earnings per share figure to reflect the 1974 inventory gain or discontinuance of price promotions in that year but indicated at trial that some adjustment for inventory gain might be appropriate. *173 Dietz next determined the appropriate earnings multiplier. He considered, among other things, the following factors: MDC's return on equity and compared it to Standard & Poor's Industrial Average; MDC's earnings per share growth; the price-earnings ratio for Busch, other brewers, and the industry at large; the recession-proof nature of the brewing industry' increasing consumption of beer products; Busch's market share and its increased advertising expenditures; and MDC's operational and market factors. In view of these factors, Dietz considered that a multiple of 11.5 times earnings would be appropriate. Dietz then applied a 20 percent discount for lack of marketability due to provisions of the Equity Agreement to the earnings multiple. Accordingly, the earnings multiple employed by Dietz was 9.2. Multiplying the 1974 earnings per share amount of $749.54 by 9.2, Dietz valued each MDC share gifted on December 23, 1974 at $6,895.77.For the MDC shares gifted on May 12, 1975, Dietz multiplied his hybrid year earnings figure of $689.14 to obtain a value of $6,340.09 per share. [3] Dietz indicated that the major increase in salary in 1975 paid to Rudolph and Roger Maris had resulted *174 in an earnings per share figure for 1975 far below what an investor would consider the true earnings per share of MDC and, accordingly, he believed the preferable and more accurate valuation method to be the wholesaler valuation methodology. Dietz also considered the Equity Agreement provisions involving termination of the distributorship for deficiencies in performance or in naming a new manager without prior Busch approval. In the event of such Busch terminations, Busch was required to purchase the inventory and assets of the business (if petitioners so chose) and to pay petitioners three times the most recent year's earnings. Multiplying the fiscal 1974 year earnings per share by three and adding book value per share to that figure, Dietz obtained a termination payment of $4,567 for 1974. For 1975 the termination figure was $4,385. Although Dietz *175 did not think that such amounts represented fair market value, he believed that such amounts provided a parameter to the valuation issue. In his view the petitioners would not sell their shares at a price below what Busch would pay them under such distress circumstances. In summary, it was the opinion of Dietz that the value of the MDC shares on December 23, 1974 and May 12, 1975 were $7,490 and $7,466, respectively. ULTIMATE FINDINGS OF FACT 1. The fair market value of the MDC stock on December 23, 1974 was $5,110.97 per share. 2. The fair market value of the MDC stock on May 12, 1975 was $5,149.19 per share. OPINION Once again we are asked to determine the value of shares of stock in a closely-held corporation, a science which, to use Winston Churchill's words, usually results in a "gross terminal logical inexactitude". Determinations of value of closely held stock involve a melding of numerous objective criteria, prior human experience and personal judgment. With respect to the objective criteria, the regulations tell us to consider a company's net worth, prospective earning *176 power, divided paying capacity and other "relevant factors" in valuing closely held stock. Section 25.2512-2(f), Gift Tax Regs.The same regulations define the term "relevant factors" as including the goodwill of the business, the economic outlook of the particular industry, the company's position in the market, its management, the degree of control represented by the shares and the value of similar or same businesses listed on a stock exchange. Section 25.2512-2(f) Gift Tax Regs.See also section 20.2031-2(f), Estate Tax Regs. Additional guidance in the valuation of closely held stock is provided in Revenue Ruling 59-60, 1959-1 C.B. 237. Petitioners initially valued the gifted shares of MDC stock at book value on the advice of their accountant. In preparing the Federal gift tax returns for the December 23, 1974 and May 12, 1975 gifts made by petitioners to their children, the accountant listed the value of each MDC share at $2,318. In his notices of deficiencies respondent determined that the fair market values of the MDC shares were $7,475 per share on December 23, 1974 and $9,566 per share on May 12, 1975. Petitioners, in their petition and at trial, have argued *177 that the value of the MDC shares on the gift dates were less than the book value reported on their Federal gift tax returns and, accordingly, seek a refund for overpayment of gift taxes. Their position is predicated on a valuation report prepared for them by Mr. Moore. He valued the December 23, 1974 gifted shares by first averaging and weighing in a number of combinations the after-tax earnings per share for the fiscal years 1971 through 1974. The averaged earnings per share figure of $500 obtained as a result of these calculations was multiplied by a multiple of six. Moore then averaged this amount ($3,000) with book value per share ($2,318) and a dividend paying capacity per share ($2,500) [4] to arrive at an undiscounted value of $2,750 per share on December 23, 1974. Moore then applied a 30 percent discount for lack of marketability and obtained a resultant value of $1,925 per gifted share on December 23, 1974. Moore believed that use of a four year average earnings per share figure as a prospective earnings amount per share was both consistent with Rev. Rul. 59-60 and appropriate in view of certain nonrecurring factors which allegedly skewed MDC's 1974 earnings *178 dramatically upward.His use of a multiple of six was predicated on selected Florida and national corporate entities with low price-earnings ratios, declining stock market prices for publicly traded brewing concerns during 1974 and 1975, declining price-earnings ratios in the brewing industry during 1974 and 1975, stock prices for certain brewers below book value per share in 1974, market and national economic conditions, business risks and the unique contributions to MDC's success by the Maris brothers. For the 1975 gifts, Moore valued the MDC stock at $2,125 per share. The increase in value was attributable to an increase in MDC's book value per share, increased MDC earnings for the first six months of fiscal 1975 and the spring rally in the stock market. Respondent's valuation expert, Dr. Dietz, offered two methods of valuation in his report and in his testimony. His preferred method was denominated the "wholesaler valuation methodology," an approach which he believed to be the commonly accepted method of valuing a beer distributorship in the industry. Under this method the selling price per share of MDC would equal the *179 annual number of cases of beer sold per share multiplied by an appropriate dollar multiple. In Dietz's view the appropriate multiple was $2 per case for the 1974 and 1975 gifts. The $2 multiple was based on MDC's sales and earnings growth, its return on equity during the period 1971 to 1974, its retained earnings, its position in the market, the dominance of Busch products and the manner in which MDC was operated by petitioners.Utilizing the 1974 fiscal year cases sold per share for the December 23, 1974 gifts and averaging the fiscal 1974 and fiscal 1975 cases sold per share to arrive at an appropriate cases sold per share figure for a one year period (April 1, 1974 to March 31, 1975) prior to the date of the May 12, 1975 gifts, Dietz determined the value of the MDC stock to be $7,490 per share on December 23, 1974 and $7,466 on May 12, 1975. Dietz also offered, both as an independent measure of valuation and as corroboration for his "wholesaler valuation methodology", an earnings valuation analysis. He did not view use of the four year average earnings per share figure as appropriate in light of MDC's continually increasing and noncylical sales and earnings figures. Instead, *180 Dietz believed that the latest year's after-tax earnings per share would be appropriate in calculating prospective earnings. Thus, for the December 23, 1974 gifts, Dietz used the fiscal 1974 (October 1, 1973 to September 30, 1974) earnings per share. For the May 12, 1975 gifts, he averaged MDC's fiscal 1974 and 1975 earnings per share to obtain the latest one year period (April 1, 1974 to March 31, 1975) earnings per share.Dietz, however, did not have at his disposal six month earning statements of MDC for the periods October 1, 1973 to March 31, 1974 and October 1, 1974 to March 31, 1975 in order to compute a more accurate earnings per share figure for the period April 1, 1974 to March 31, 1975. Thus, the earnings per share utilized by Dietz in his earning valuations was $749.54 for the 1974 gifts and $689.14 for the 1975 gifts. Respondent has since recalculated the earnings per share for the period April 1, 1974 to March 31, 1975 as $764.74 per share. This recalculation was made possible through the use of six month earning statements of MDC and fiscal year earnings figures. [5]
*181 Dietz did not adjust the 1974 earnings per share figure downward to reflect the non-recurring inventory gain of that year but he indicated at trial that some adjustment might be in order. In the same view Dietz did not adjust 1975 earnings upward to reflect sizeable increases in compensation paid to the Maris brothers by MDC but he indicated at trial that he believed true fiscal 1975 earnings were understated because of such compensation increases.
After computing the earnings per share figures for the 1974 and 1975 gifts, Dietz applied a multiple of 11.5 to those figures and discounted that amount by 20 percent to reflect lack of marketability. His selection of a 11.5 multiple was based on brewing industry stock market prices, earning-ratios, MDC's growth record, MDC's market and dominance of its products, MDC's return on equity, business risk, MDC's retained earnings and the internal operations of MDC. Multiplying the fiscal 1974 earnings per share figure of $749.54 by 9.2 (11.5 multiple discounted 20 percent), Dietz valued each MDC share gifted on December 23, 1974 at $6,895.77. For the MDC shares gifted on May 12, 1975, Dietz multiplied the earnings per share for the period *182 April 1, 1974 to March 31, 1975 ($689.14) by 9.2 to obtain a value of $6,340.09. Dietz believed, as indicated earlier, that this amount is understated due to major increases in compensation paid to the Maris brothers. If respondent's earnings per share for the period April 1, 1974 to March 31, 1975 in used, the value of each MDC share gifted on May 12, 1975 is $7,035.60 ($764.74 x 9.2). Having examined the evidence presented by the parties, and as reflected in our ultimate findings of fact, we have arrived at an independent value per share on the dates of the gifts. We were impressed by the background, experience and knowledge of Mr. Moore and Dr. Dietz and we have found certain aspects of both of their reports and testimony helpful in determining the proper value of the gifted MDC shares. On balance, we regard Dietz's testimony more persuasive and convincing. For example, we agree with him that under an earnings valuation approach for the MDC shares the latest years earnings per share is appropriate rather than a four year average of earnings.MDC's earnings were noncylical and experienced continual growth. On the other hand, it is clear that part of the fiscal 1974 earnings *183 was due to a nonrecurring inventory gain of $59,500 and that a downward adjustment of the 1974 earning per share figure is necessary. We also think that a discount of 30 percent for lack of marketability is appropriate in these circumstances. With respect to the appropriate earnings multiple to be used in computing the value of the MDC shares on the gift dates, we are cognizant that each expert has selectively picked other companies' price-earnings ratios that provide some justification for their ultimate earnings multiple selected. Again, on balance, we rely more on he selection by respondent's expert of financial criteria in the process of determining an appropriate multiple. We think the use by petitioners' expert of unrelated Florida companies with low multiples provides little justification for his choice of six as a multiple. Moreover, petitioners' analysis of brewing industry stock prices and price-earnings ratios was incomplete in that it failed to consider Busch's price earnings ratios singularly or in a composite average. Having reviewed MDC's earnings and sales growth, its return on equity, its strong cash position, book value, the various business risks attendant *184 to the company, the terms of its agreement with Busch, stock prices and price-earnings ratios in industry at large and in the brewing, distilling and soft beverage bottling industries, we think that the appropriate multiple under an earnings valuation approach is 10.5. Accordingly, we conclude that the value of each MDC share gifted on December 23, 1974 should be determined by taking the fiscal 1974 after-tax earnings per share reduced by nonrecurring gain ($695.37) [6] multiplied by earnings multiple of 10.5 and discounted 30 percent, or a value of $5,110.97 per share. The value of each MDC share gifted on May 12, 1975 should be determined by taking the earnings per share for the period April 1, 1974 to March 30, 1975 [7] as computed by respondent but adjusted for 1974 nonrecurring inventory gain ($700.57) multiplied by an earnings multiple of 10.5 and discounted 30 percent, or a value of $5,149.19 per share. *185 We are satisfied that these figures represent a more correct indication of the values of the MDC shares on the gift dates than the values urged upon us by the parties. Having reached these values under an earnings valuation approach, we find it unnecessary to comment on the appropriateness of respondent's wholesaler methodology in valuing beer distributorship stock for the purposes of section 2512. To reflect the conclusions reached herein, Decisions in all dockets will be entered under Rule 155. Footnotes
1. Consolidated herewith are the following cases: Roger E. Maris v. Commissioner, Docket No. 10405-78; Particia A. Maris v. Commissioner, Docket No. 10406-78; and Constance E. Maris v. Commissioner, Docket No. 10408-78.↩
2. The pretax earnings per share for fiscal 1975 were $1,164.33. Dietz applied a 46% tax rate to that amount to obtain fiscal 1975 earnings per share of $628.74. Dietz then averaged the $628.74 for 1975 and the $749.54 for 1974 to obtain a April 1, 1974 to March 30, 1975 earnings per share figure of $689.14. In his report Dietz noted that the salary paid to petitioners increased by $300,000 from fiscal 1974 to 1975. Dietz further noted that for every $100,000 increase in salary, the earnings per share figure would decrease $108. Nevertheless, Dietz did not adjust the fiscal 1975 earnings per share figure upward on account of the higher salaries paid petitioners in 1975. In respondent's brief the earnings per share figure for the period April 1, 1974 to March 30, 1975 (for the shares gifted May 12, 1975) has been recomputed. Such recomputation was made possible by use of six month earning reports prepared by MDC's accountants for the periods October 1, 1973 to March 31, 1974 and October 1, 1974 to March 31, 1975. In conjunction with the full year earning figures, respondent has recomputed the earnings per share for the year period April 1, 1974 to March 31, 1975 to equal $764.74. This earnings per share figure is also based on an average 46% tax rate.↩
3. As noted earlier, respondent through he use of petitioners' books and records recomputed the earnings per share figure for the period April 1, 1974 to March 31, 1975 as $764.74. Applying a 9.2 multiple to that amount, each MDC share gifted in 1975 would have a value, as computed under the earnings approach, of $7,035.60.↩
4. It is not clear how Moore obtained this amount.↩
5. Petitioner has attacked respondent's and his expert's use of a 46 percent tax rate in computing fiscal 1975 after-tax earnings per share and earnings per share for the annual period April 1, 1974 to March 31, 1975. Respondent used the 46 percent tax rate because the average tax rate paid by MDC over the period 1971 to 1974 was 46 percent. For purposes of this valuation, we think the 46 percent rate is appropriate.↩
6. Fiscal 1974 earnings per share unreduced by the inventory profit was $749.54. If MDC's taxable income is reduced by the $59,500 of inventory gain, the remaining income is $643,859 and applying an average tax rate of 46% to that figure results in a corrected income after tax figure of $347,684. That amount, divided by the number of shares (500) results in an adjusted per share earnings of $695.37. ↩
7. Petitioners attack respondent's use of the period April 1, 1974 to March 30, 1975 as the period for determining the earnings per share for the May 12, 1975 gifts. They contend that the use of a hybrid year is capricious and inconsistent with Rev. Rul. 59-60, supra↩. Their argument is without merit. Although the entity was on a fiscal year commencing on October 1 for income tax and financial accounting purposes, the determination of the latest year period prior to the gift for purposes of valuation of the shares is perfectly acceptable and consistent with valuation techniques. It would appear to us that in the usual sale of a business or stock in such business the most recent and up to the minute picture of a firm's earnings would be appropriate.