RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0405P (6th Cir.)
File Name: 01a0405p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

-------------------------

WALTER L. GROSS, JR. and
BARBARA H. GROSS
(99-2239); CALVIN C.
LINNEMANN and PATRICIA G.
LINNEMANN (99-2257),
     *Petitioners-Appellants,*

     *v.*

COMMISSIONER OF INTERNAL
REVENUE,
     *Respondent-Appellee.*

Nos. 99-2239/2257

On Appeal from the United States Tax Court.
Nos. 97-04460; 97-04469—James S. Halpern,
Tax Court Judge.

Argued: October 27, 2000

Decided and Filed: November 19, 2001

Before: DAUGHTREY and CLAY, Circuit Judges;
COHN, Senior District Judge.*

_____

*The Honorable Avern Cohn, Senior United States District Judge for
the Eastern District of Michigan, sitting by designation.

1

———————

**COUNSEL**

**ARGUED:** Gerald J. Rapien, TAFT, STETTINIUS & HOLLISTER, Cincinnati, Ohio, for Appellants. David I. Pincus, UNITED STATES DEPARTMENT OF JUSTICE, APPELLATE SECTION, TAX DIVISION, Washington, D.C., for Appellee. **ON BRIEF:** Gerald J. Rapien, James J. Ryan, TAFT, STETTINIUS & HOLLISTER, Cincinnati, Ohio, for Appellants. David I. Pincus, A. Wray Muoio, UNITED STATES DEPARTMENT OF JUSTICE, APPELLATE SECTION, TAX DIVISION, Washington, D.C., for Appellee.

CLAY, J., announced the judgment of the court and delivered an opinion, in which DAUGHTREY, J., and COHN, D. J., concurred except as to Part II.B.1. COHN, D. J. (pp. 31-39), delivered a separate opinion, in which DAUGHTREY, J. concurred, which constitutes the opinion of the court on the issue addressed in Part II.B.1.

———————

**OPINION**

———————

CLAY, Circuit Judge. Taxpayers, Walter L. and Barbara H. Gross, Jr., along with Calvin C. and Patricia G. Linnemann, appeal from the order of the United States Tax Court valuing certain gifts of corporate stock at $10,910 per share. To the extent that the valuation was based upon the use of a contested valuation approach, I would find that the tax court's decision was clearly erroneous; and would therefore reverse the tax court's decision and remand for further proceedings. However, inasmuch as Judge Daughtrey and Judge Cohn find that the tax court did not clearly err in concluding that it was appropriate not to tax affect the stock in order to determine its fair market value, the tax court's decision is **AFFIRMED**.

Overall, the entire valuation process is a fiction - the purpose of which is to determine the price that the stock would change hands from a willing buyer and a willing seller. However, a court is not required to presume hypothetical, unlikely, or unreasonable facts in determining fair market value. *See Estate of Watts*, 823 F.2d 483, 487 n.2 (11th Cir. 1987). Valuation is a fact specific task exercise; tax affecting is but one tool in accomplishing that task. The goal of valuation is to create a fictional sale at the time the gift was made, taking into account the facts and circumstances of the particular transaction. The Tax Court did that and determined that tax affecting was not appropriate in this case. I do not find its conclusions clearly erroneous.

F.2d 184 (6th Cir. 1957). Thus, the fact that tax affecting may have been approved in other cases, and was even approved in prior returns filed by the Taxpayers, does not, and should not, preclude a different result in another case, particularly where there is disagreement over whether to tax affect in determining the value of stock in the first place.

### III.  Conclusion

Reviewing the conflicting experts' opinions, it appears that Dr. Bajaj's valuation was from an academic perspective, and he clearly took a scholarly approach to the valuation issue. McCoy's valuation, on the other hand, was from the perspective of a business professional, who has performed numerous valuations in his professional career.   This distinction is observed not to diminish McCoy's expertise or elevate Dr. Bajaj's, but simply to point out the different ways the experts approached the valuation question to the facts at hand.   Ultimately, the Tax Court found that Dr. Bajaj's method was the better reasoned one under the facts and circumstances of the case.  I cannot say this was clear error.

The Taxpayers spend a good deal of time arguing that willing buyers would not know Dr. Bajaj's valuation techniques, and that Dr. Bajaj used data available after the date of the gift, and therefore the Tax Court erred in applying the willing buyer- willing seller rule.  This argument is poorly conceived.   First, the Tax Court is not prohibited from considering post-valuation data if relevant to shed light on facts existing on the date of the valuation. *See Estate of Gilford v. Comm'r of Internal Rev.*, 88 T.C. 38, 52-53 (1987). Second, the purpose of valuation is to determine what a willing buyer would pay, and what a willing seller would accept, for the stock on the date of the valuation; it is not to determine what methodology the willing buyer would apply. The willing buyer-willing seller rule presupposes that the price will be the fair market value. Valuation, through the use of expert methodology, is the means, not the end, to application of the willing buyer willing seller rule.

### FACTS

The  common  question  presented  by  this  consolidated appeal is the fair market value of certain shares of corporate stock transferred as gifts by Taxpayers Walter L. Gross, Jr., and  Patricia  G.  Linnemann  to  their  respective  children. Taxpayers Barbara H. Gross and Calvin C. Linnemann, the wife and husband of the aforementioned taxpayers, are parties because  they  consented  to  having  the  gifts  made  by  their respective spouses as also having been made one-half by them for  federal  gift  tax  purposes.   The  shares  in  question  are shares of stock of Pepsi-Cola Bottlers, Inc. ("G&J"), an Ohio corporation that bottles and distributes various beverages in Ohio and Kentucky. G&J's business operations can be traced back  to  a  partnership  formed  in  the  1920s  between  two married couples, Isaac N. and Esther M. Jarson and Walter L. and Nell R. Gross.  This business was incorporated in 1969. By  the  time  the  questioned  gifts  were  made  in  1992,  the founders of the corporation were deceased and ownership of G&J had devolved to their relatives: the Gross family group (which included members of the Linnemann family) and the Jarson family group.  Directly and through voting trusts, each family group owned 50% of the outstanding shares of stock of G&J.

By  a  written  agreement  dated  November  1,  1982, G&J's shareholders  elected  to  be  taxed  as  a  small  business corporation ("S corporation"), pursuant to Subchapter S of the Internal Revenue Code, I.R.C. §§ 1361-1379, for at least 10 years.   This  subchapter  was  enacted  to  eliminate  the  tax disadvantages  that  might  dissuade  small  businesses  from adopting the corporate form and to lessen the tax burden on such businesses.  The statute accomplishes these goals by means  of  a  pass-through  system  under  which  corporate income,  losses,  deductions,  and  credits  are  attributed  to individual shareholders in a manner akin to the tax treatment of  partnerships.    *See*  I.R.C.  §§  1366-1368;  *Bufferd  v. Commissioner*, 506 U.S. 523, 524-25 (1993).  In practical terms, this means that the corporation pays no state or federal income tax. *See* I.R.C. §§ 1361-1363; OHIO REV. CODE ANN.

§ 5733.09(B) (Banks-Baldwin 1995). Rather, the S corporation passes its income through to its shareholders, who report their *pro rata* shares of that income on their individual tax returns. *See* I.R.C. § 1366. G&J maintained S corporation status through July 31, 1992, at which time there were no plans to change its S corporation status.

Also in 1982, the members of the Gross/Linnemann family group entered into an agreement restricting the transferability of their G&J stock. This restrictive agreement permitted certain transfers within the Gross/Linnemann family group, but provided that if other transfers were attempted, the G&J stock would be purchased by the family group at book value.[1] More importantly, the agreement also restricted any transfers that would jeopardize G&J's S corporation status. This agreement was still in effect as of July 31, 1992.

At that time, G&J was the third largest independent bottler of Pepsi-Cola products. G&J had an exclusive franchise agreement to distribute these products within several geographic territories. These products, including the brand names Seven-Up, Dr. Pepper, and five variations of Pepsi-Cola, were distributed to over 24,000 customers including wholesale and retail outlets. G&J's operational infrastructure included plants, warehouses, over 800 vehicles, and over 11,000 soft drink vending machines. From 1988 to 1992, G&J enjoyed steady increases in its operational income, total income, and distribution to shareholders. In addition, G&J's shareholder distributions nearly totaled the company's entire income for each of these years.

On July 31, 1992 Walter Gross gave each of his three children 124.5 shares of G&J stock, and Patricia Linnemann gave each of her two children 187.5 shares of G&J stock. The gifts to each child represented less than one percent of the corporation's outstanding shares. Walter Gross and his wife

---

[1] Members of the Jarson family group entered into a similar restrictive agreement regarding their G&J shares on April 1, 1983. This agreement was also in effect as of July 31, 1992.

affect an S corporation's projected earnings with an undiscounted corporate tax rate without facts or circumstances sufficient to establish the likelihood that the election would be lost." (JA at 192). The lead opinion's conclusion that willing buyers and willing sellers might consider that G&J would lose its Subchapter S status is contrary to the evidence of record at the time the gift was made and reflects its own independent opinion of what willing buyers and sellers would consider when valuing G&J's stock.

The lead opinion also criticizes the Tax Court's decision regarding tax affecting because prior decisions permitted tax affecting, and because the IRS accepted prior returns of the Taxpayers which contained valuations that were tax affected. The lead opinion relies on *E.W. Bliss Co. v. United States*, 224 F. Supp. 374 (N.D. Ohio 1963), *aff'd* 351 F.2d 449 (6th Cir. 1965) to support its conclusion that the IRS acted arbitrarily in refusing to accept the returns at issue. *Bliss*, however, is inapposite. In *Bliss*, the district court held that the "Commissioner is without authority to act retroactively in a particular case where his own regulations are broad enough to allow the taxpayer's method as one in accordance with generally accepted accounting principles or best accounting practices and one which was consistently followed." 224 F. Supp. at 384. First of all, as noted above, there was disagreement among the experts as to whether tax affecting was generally accepted. Second, *Bliss* involved an appeal from a decision of the Commissioner to the district court, not an appeal from a decision of the Tax Court. Thus, the district court presumably had more latitude in reviewing the Commissioner's decision to make the determination that the Commissioner acted arbitrarily in that case.

Most significantly, however, as the Commissioner points out, the Commissioner is not precluded from correcting an error. *See Sirbo Holdings, Inc. v. Commissioner*, 509 F.2d 1220, 1222 (2d Cir. 1975); *Wagner v. United* States, 387 F.2d 966, 968 (Ct. Cl. 1967); *Kehaya v. United States*, 355 F.2d 639, 641 (Ct. Cl. 1966), *Ward v. Comm'r Internal Rev.*, 240

review, I do not believe that the Tax Court clearly erred in this regard.

## 2.

The lead opinion appears to emphasize the apparent unfairness to Taxpayers if G&J's stock is not tax affected and accuses the IRS and the Tax Court of being "hypocritical" and "arbitrary" in their valuations. Unfairness, however, is not the issue and even if it was, the Taxpayers were not unfairly treated by not tax affecting G&J's stock. First, the lead opinion disagrees with the Tax Court's finding that the IRS policy manuals do not establish that tax affecting is a necessary part of valuing an S Corporation. I do not believe that this finding is clearly erroneous and in fact is well supported in the record. Not only do the statements in the IRS manuals fail to affirmatively advocate tax affecting for all S Corporation valuation, both the guide and handbook provide that are not to be relied upon as binding authority, thus even if Taxpayers relied on these materials, their reliance was not justified.

Moreover, focusing solely on the perceived unfairness to the Taxpayers is improper because the willing buyer willing seller rule does not permit a determination of fair market value based solely on the price-lowering desires of the willing buyer. *See Mandelbaum v. Comm'r of Internal Rev.*, 69 T.C.M. (CCH) 2852, 2866 (1995), *aff'd without published opinion*, 91 F.3d 124 (3d Cir. 1996)("[i]gnoring the views of a willing seller is contrary to the willing buyer/willing seller test"). Thus, determining fair market value also requires consideration of the standpoint of the willing seller.

Secondly, the lead opinion discusses the possibility of G&J losing its Subchapter S status, concluding that "a willing buyer and seller anticipating the corporation's future earnings would have to note the fact that G&J's S corporation status was not guaranteed." To the extent that the lead opinion finds that G&J's Subchapter S status "was not guaranteed," this conclusion appears to contradict the Tax Court's factual finding that "[w]e do not however, think it is reasonable to tax

Barbara each reported one-half of the asserted value of the gifts to their children on a timely filed Form 709, United States Gift (and Generation Skipping Transfer) Tax Return ("Form 709"). Patricia Linnemann and her husband Calvin did the same with respect to the gifts to their children. In reporting these gifts ro the IRS, the Grosses and Linnemanns ("Taxpayers") relied on an appraisal report prepared by Business Valuations, Inc. This report, dated July 22, 1992, valued the G&J stock at $5,680 per share as of May 31, 1992. Based upon this report, the Grosses reported a total gift value of $2,121,480 and the Linnemanns reported a total value of $2,130,000. Upon receiving the report of these gifts, the Commissioner of Internal Revenue ("Commissioner") issued notices of deficiency to Taxpayers based on his valuation of the stock at a much higher amount, $11, 738.00. The Commissioner later agreed that the shares had a value of no more than $10,910 as of the gift date. Taxpayers challenged the Commissioner's determinations in the United States Tax Court.

At trial, both parties relied on expert testimony to establish the value of the shares of G&J stock. Taxpayers relied upon the Testimony of David O. McCoy and Charles A. Wilhoite. McCoy, a business appraiser, prepared a report valuing the common shares of G&J. He was accepted as an expert witness and his report was accepted into evidence as direct testimony. McCoy also prepared an additional report rebutting the testimony of the Commissioner's lone expert witness. Wilhoite is an appraiser and valuation expert who prepared a second rebuttal report in response to the Commissioner's expert. Wilhoite was accepted as an expert on appraisal and valuation methodology and his report was also accepted into evidence as his direct testimony. The Commissioner called Mukesh Bajaj, Ph.D., as an appraisal expert. Bajaj presented two reports, one valuing minority interests in G&J as of the gift date, and one in rebuttal to McCoy's first report. Bajaj was accepted as an expert witness and his reports were accepted into evidence as his direct testimony.

The experts on either side determined the value of the G&J stock using "income approaches" in which a company's fair market value is determined by calculating the present value of its projected future income. One approach used by both parties was the "discounted future cash flow" approach.[2] Experts on both sides also agreed that the value of the shares should be discounted to reflect the fact that, as shares of a closely held S corporation, they are not readily marketable. But two basic disagreements distinguished the experts' calculations of the value of G&J stock.

The first disagreement was whether, under the discounted future cash flow approach, to reduce the corporation's projected future income by deducting hypothetical corporate income taxes even though as an S corporation G&J did not pay income taxes. This process is known as "tax affecting." McCoy testified that in 1992 various professional associations published standards governing the conduct of professional business appraisers and that professional appraisers were ethically bound to follow those standards, citing a publication entitled the Uniform Standards of Professional Appraisal Practice ("USPAP"). This document requires appraisers to be aware of, understand, and correctly employ recognized methods and techniques necessary to produce a credible appraisal (the "standards rule"). McCoy testified that in order to comply with the standards rule, and produce a credible appraisal, it was necessary for professional appraisers to "tax affect" the earnings of an S corporation. In order to "tax

---

[2] McCoy's initial report used three separate methods to determine the value of the stock shares: the market price comparison approach, the discounted future free cash-flow method, and valuation by capitalization of earnings. He determined a weighted average value of the results of these three approaches and then applied a discount for the lack of marketability, eventually arriving at a value of $5,680 per share.

Under the discounted future free cash-flow method, McCoy considered G&J to be an asset capable of producing cash flows to its owners for an infinite number of periods. He then determined the present value of G&J's stock by hypothesizing the amount of available cash for each such period, discounting each amount to reflect the delay in payment and the risk of nonpayment, and then summing the results.

benefit that shareholders expect from an S corporation election is a reduction in the total tax burden imposed on the enterprise. The owners expect to save money, and we see no reason why that savings ought to be ignored as a matter of course in valuing the S corporation." (JA at 194).

C.

1.

As noted in the lead opinion, Dr. Bajaj and McCoy disagreed over whether tax affecting was a generally accepted practice in 1992. Indeed, McCoy's testimony, when carefully reviewed, reveals that even he was not certain whether tax affecting was generally accepted, acknowledged some disagreement on this point, and was equivocal on whether he would continue to tax affect. The lead opinion, however, finds that the Tax Court clearly erred in its decision to not tax affect G&J's stock because willing buyers and willing sellers would have tax affected the stock in 1992. While I do not necessarily disagree with framing the issue in this manner, I do disagree with the way in which the lead opinion analyzes the issue. The lead opinion accuses the Tax Court of focusing on "its theoretical belief that tax affecting was not [] appropriate." The lead opinion also states that "the tax court's judgment was less than sound" and "flies in the face of the evidence on the record." I read the record differently. The Tax Court was faced with the opinions of competing valuation experts and accepted one over the other. While the Tax Court did not explicitly state that it found Dr. Bajaj's valuation more "credible," the Tax Court certainly found as much when it declined to tax affect G&J's stock. Moreover, while the Tax Court did state that it did not believe that tax affecting was "appropriate as a matter of economic theory," (JA at 194), this statement was made in the context of deciding whether or not to tax affect, and reflects the Tax Court's opinion that McCoy's valuation including tax affecting was not appropriate. Given the disagreement on the propriety of tax affecting, and applying the proper standard of

valuing closely held corporations. You need only to adjust the earnings from the business to reflect estimated corporate income taxes that would have been payable had the Subchapter S election not been made.

The handbook provides in part:

If you are comparing a Subchapter S Corporation to the stock of similar firms that are publicly traded, the net income of the former must be adjusted for income taxes using that corporate tax rates applicable for each year in question, and certain other items, such as salaries. These adjustments will avoid distortions when applying industry ratios such as price to earnings.

### 2.

The Tax Court found that applying a 0% corporate tax rate, effectively not tax affecting, G&J's stock was appropriate. The Tax Court discussed the competing expert's opinions, paying particular attention to Taxpayers' experts and examined their opinions in light of the facts of the case. The Tax Court first noted that the IRS materials quoted above "neither require tax affecting nor lay[] the basis for a claim of detrimental reliance" inasmuch as Taxpayers "failed to prove that they relied on [the IRS materials] in any way." (JA at 190-91). The Tax Court also rejected the Taxpayers' justification for tax affecting that it addresses the possibility that an S corporation may distribute less than all of its income, which would not be sufficient to cover the shareholder's tax obligations. The Tax Court explained that "G&J had a strong growth record and a history of making cash distributions to shareholders that nearly equaled its income [and] . . . it would not be reasonable to assume G&J would not continue this practice." (JA at 191). The Tax Court also rejected the argument that G&J might lose its Subchapter S status as a basis for tax affecting its stock because there was not sufficient evidence that G&J's status would be lost. Overall, the Tax Court was not convinced that tax affecting was an appropriate valuation method for valuing G&J's stock. The Tax Court explained that "the principle

affect" G&J's stock, McCoy introduced a fictitious tax burden, equal to an assumed corporate tax of 40%, which he then applied to reduce the estimated future income of G&J. Both McCoy and Wilhoite testified that despite some growing controversy surrounding the issue, use of a 40% tax affect was the accepted practice at the time Taxpayers performed the transaction in question.

Bajaj also relied on the discounted free flow cash method to value the G&J stock. But, although he was informed of G&J's S corporation status, Bajaj concluded that using a 0% tax rate was appropriate to determine the future earnings of G&J that would be available for distribution. Thus, in essence, Bajaj did not tax affect the stock at all.

The second disagreement between the experts dealt with the amount of the lack of marketability discount. McCoy examined several studies discussing the lack of marketability inherent in closely held and restricted securities such as G&J stock. He testified that his research reflected that an average lack of marketability discount for shares that would eventually become freely tradable was "30%+" and ultimately found that a discount rate of 35% was required to fully compensate an owner for the lack of marketability of those shares. On behalf of the Commissioner , Bajaj also reviewed the commonly cited published studies examining lack of marketability discounts, dividing them into two groups: those that analyzed sales of restricted stock by firms that also had publicly traded shares, and those that compared the share prices used in several successful initial public offerings ("IPO"s). According to Bajaj, the first category of studies revealed that median discounts ranged from 10%-40%. But he determined that only about 10%-15% of these discounts could be attributed to a lack of marketability. Bajaj then concluded that the studies regarding the second category of firms was not useful in evaluating discount levels for two reasons. First, he indicated that many of the pre-IPO transactions did not occur at fair market values. Second, Bajaj surmised that referring only to discounts of companies that conducted successful IPOs would create a biased sample

that could artificially inflate the discount rate. In the end, Bajaj relied upon his own study in which he conducted an empirical analysis of marketability discounts, considering such factors as G&J's generous dividend policy and its restrictive transfer agreements, the latter of which he considered to be a greater marketability restriction. This study considered 157 transactions that took place from 1980 through 1996, 75 of which took place before July 31, 1992, and 79 of which took place after that date. He concluded that the highest predicted discount for G&J was 12.84%. Based on this study as well as the other studies relied upon by McCoy, Bajaj determined that the lack of marketability discount for G&J shares should be 13%. But when considering other factors unique to G&J, such as the restrictive agreements and the fact that the corporation paid out most of its earnings to its shareholders, he came to a final figure of a 25% lack of marketability discount.

Taxpayers filed a motion *in limine* to exclude Bajaj's testimony regarding both tax affecting and the lack of marketability discount as being based upon unproven methodology. The tax court denied these motions and admitted Bajaj's testimony and reports into evidence. After hearing evidence presented by the experts, the tax court determined that the G&J stock should be discounted using a tax affect of 0% and that the lack of marketability discount should be 25%. Using these figures the tax court ultimately determined that the G&J stock should be valued at a rate of $10,910 per share. Taxpayers now appeal from this order. Specifically, they contest (1) the admissibility of expert testimony by the IRS' expert witness based upon methods which taxpayers claim were scientifically unreliable; and (2) the validity of the court's valuation.

## I. ADMISSIBILITY OF EVIDENCE

On appeal, Taxpayers allege that the tax court did not follow proper procedures in admitting certain aspects of Bajaj's testimony on behalf of the Commissioner. For the

analysis." *Ebben v. Comm'r of Internal Rev.*, 783 F.2d 906, 909 (9th Cir. 1986).

### B.

#### 1.

Dr. Bajaj opined that tax affecting G&J's earnings was inappropriate because G&J does not pay corporate taxes, and given this closely held status and restriction on stock transfers, there was no reason to believe that G&J would not continue as an S Corporation. Dr. Bajaj also reasoned that based on G&J's past practice of distributing nearly all of its income to its shareholders, a zero percent corporate tax rate was appropriate to make in determining G&J's corporate earnings available for distribution. Moreover, Dr. Bajaj emphasized that because an S Corporation receives a tax benefit (no corporate taxes), such a benefit should not be ignored in valuing G&J's stock.

McCoy, on the other hand, opined that applying a fictitious 40% tax rate to reduce G&J's earnings was appropriate. McCoy testified that tax affecting is an accepted practice in valuation of an S Corporation. McCoy explained that the tradeoffs shareholders incur as a result of being part of an S Corporation must be accounted for, which is accomplished by tax affecting. McCoy indicated that if an S Corporation distributes less than all of its income to its shareholders, the distributions might not cover the shareholders' tax obligations. Thus, tax affecting offsets that potential burden.

McCoy also cited to two internal documents of the Internal Revenue Service that apparently says tax affecting an S Corporation's earnings for valuation: a valuation guide for income, estate, and gift taxes (the guide), an examination technique handbook for estate tax examiners (the handbook) (collectively, the IRS materials). The guide states in part:

> [S] corporations are treated similar to partnerships for tax purposes. S Corporations lend themselves readily to valuation approaches comparable to those used in

Where, as here, the gift is stock, its value for gift tax purposes is the fair market value of the stock on the date of the transfer, and "[a]ll relevant facts and elements of value as of the time of the gift shall be considered."  26 C.F.R. § 25.2512-1 (1992).  For publicly traded stock, valuation can generally be based on market selling prices.  *See* 26 C.F.R. § 25.2512-2(b) (1992).  For closely held corporations, such as G&J, for which there is no public trading market, valuation of stock is therefore based on of a variety of factors.

Revenue Ruling 59-60 outlines the general approach, methods and factors to be considered in valuing the shares of stock of closely held corporations for estate and gift tax purposes, stating:

> 3.01.  A determination of fair market value, being a question of fact, will depend upon the circumstances in each case.  No formula can be devised that will be generally applicable to the multitude of different valuation issues arising in estate and gift tax cases.... A sound valuation will be based upon all the relevant facts, but the elements of common sense, informed judgment and reasonableness must enter into the process of weighing those facts and determining their aggregate significance.

Rev. Rul. 59-60, 1959-1 C.B. 237, 238.

Valuing closely held stock incorporates a number of alternative methods of valuation, and the appellate courts have afforded the tax court broad discretion in determining what method of valuation most fairly represents the fair market value of the stock in light of the facts presented at trial. *See Palmer v. Comm'r of Internal Rev.*, 523 F.2d 1308 (8th Cir. 1975).  Moreover, "complex factual inquiries such as valuation require the trial judge to evaluate a number of facts: whether an expert appraiser's experience and testimony entitle his opinion to more or less weight; whether an alleged comparable sale fairly approximates the subject property's market value; and the overall cogency of each expert's

following reasons we hold that the tax court did not abuse its discretion in admitting this testimony.

## A.

The tax court's decision whether to admit expert testimony, as well as its decisions regarding how to determine the reliability of that testimony, are reviewed for an abuse of discretion. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

## B.

Federal Rule of Evidence 702 governs the admissibility of expert testimony.  That Rule provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."  FED. R. EVID. 702.  In *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993), the Supreme Court held that Rule 702, along with Rule 104(a) (relevance), confers upon trial judges a special obligation to ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand. Pertinent evidence based on scientifically valid principles will satisfy those demands."[3]

The *Daubert* Court also suggested several criteria that might assist trial courts in making a preliminary evaluation of expert testimony before admitting it:  (1) whether a theory or technique has been or can be tested; (2) whether the technique has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) whether the

---

[3] To this end, the Court found that "knowledge" as used in Rule 702 means "more than subjective belief or unsupported speculation" and the term "applies to any body of known facts or to any body of ideas inferred from such facts or accepted as truth on good grounds."  *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 590 (1993).

technique has been accepted by the "relevant scientific community," or "has been able to attract only minimal support within the community." *Daubert*, 509 U.S. at 593-94. Subsequent decisions have further refined the requirements of *Daubert*. The Supreme Court has extended *Daubert* to include any testimony based on "technical" and "other specialized knowledge." *See Kumho Tire Co., Ltd.*, 526 U.S. at 152. We have previously held that the mandates of *Daubert* and *Kumho Tire* also apply to decisions of the United States Tax Court. *See Conti v. Commissioner*, 39 F.3d 658, 662 (6th Cir. 1994).

The Court has stopped short of turning the *Daubert* test into a straightjacket. Rather, it has insisted that trial courts must enjoy "the same kind of latitude in deciding how to test an expert's reliability, and to decide whether or when special briefing or other proceedings are needed to investigate reliability, as it enjoys when it decides whether or not that expert's relevant testimony is reliable." *Kumho Tire Co., Ltd.*, 526 U.S. at 152. Thus, though helpful, the *Daubert* factors are not dispositive in every case. Instead, the Supreme Court has instructed trial courts to consider the specific factors identified in *Daubert* where they are reasonable measures of the reliability of expert testimony. Furthermore, "[w]hether *Daubert's* specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." *Id.* at 139. Nonetheless, this call for broad discretion cannot be interpreted as an invitation for the trial judge "to adopt an excessive level of generality in his gate-keeping inquiry." *See Black v. Food Lion*, 171 F.3d 08, 313 (5th Cir. 1999). With this admonition in mind, we now consider the tax court's basis for accepting Bajaj's testimony in the instant case.

### 1. Testimony Regarding Tax Affecting G&J's Earnings

The tax court acknowledged that Bajaj's testimony was of a "technical nature" and, therefore, determined that *Daubert* applied in the instant case. But Taxpayers contend that the

---

**CONCURRING IN PART, DISSENTING IN PART**

---

COHN, Senior District Judge.

#### I. Introduction

I concur with Parts I., II.A., and II.B.2 of the lead opinion. However, because I believe that the Tax Court did not clearly err in concluding that it was appropriate not to tax affect the stock in order to determine its fair market value, I respectively disagree with Part II.B.1 and therefore find that the decision of the Tax Court must be affirmed on this ground.

#### II. Analysis

##### A.

Taxpayers essentially argue that the valuations presented by their experts are more credible than Dr. Bajaj's valuation and the Tax Court erred in accepting Dr. Bajaj's valuation. This appeal really presents a battle of the experts on the question of how the stock of a closely held S Corporation, such as G&J, should be valued.

Section 2501 of the Internal Revenue Code imposes a gift tax "on the transfer of property by gift during [the] calendar year by any individual." 26 U.S.C. § 2501(a)(1) (1988). Section 2512(a) addresses the valuation of gifts, stating, "[i]f the gift is made in property, the value thereof at the date of the gift shall be considered the amount of the gift." 26 U.S.C. § 2512(a) (1988). In interpreting this provision, section 25.2512-1 of the Treasury Regulations on gift tax provides, "[t]he value of the property is the price at which such property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell, and both having reasonable knowledge of relevant facts." 26 C.F.R. § 25.2512-1 (1992). This is known as the willing buyer willing seller rule.

### III.

In considering the parties' arguments on appeal, I would find that the record does not support the tax court's ultimate valuation of G&J stock at $10,910 per share. The tax court derived this figure by considering multiple factors, only two of which Taxpayers contested in this case -- tax affecting and the lack of marketability discount. Despite the finding that the testimony of the Commissioner's expert was admissible with respect to both of these factors, this testimony was insufficient to support the court's valuation decision. Although I would conclude that the tax court's decision to apply a 25% lack of marketability discount was supported by facts on the record, I also am of the belief that the court's decision to tax affect the stock by 0% did not accurately reflect the fair market value of G&J stock as determined under the willing buyer/willing seller standard. Instead of relying upon real-world evidence, the court reverted to its own perception of the proper approach to tax affecting, thereby deviating from the time-sensitive willing buyer/willing seller standard. I therefore would hold that to the extent it was based upon the use of a 0% tax affect the court's ultimate valuation of $10,910 was clearly erroneous. However, as explained in Judge Cohn's opinion, neither he nor Judge Daughtrey believe that the tax court erred in utilizing the 0% tax affect in order to determine the stock's valuation.

### CONCLUSION

For the aforementioned reasons, I would reverse the valuation decision of the tax court and remand for revaluation in a manner not inconsistent with my opinion; however, Judge Cohn's opinion constitutes the holding of the court in this case; that is, that the tax court's decision is **AFFIRMED**.

court abused its discretion by terminating its reliability review of the expert's testimony regarding tax affecting upon determining that his methodology was appropriate. Bajaj testified that under the discounted cash flow method, considering a hypothetical corporate tax rate of 40% would be improper. Thus, he testified that his valuation of the G&J stock was based upon use of the discounted cash flow approach with a 0% tax affect.

The tax court found that when properly applied, the discounted cash flow method, which was used by both parties, is a reliable tool for financial analysis. Noting that "value is a question of fact," the court found that the "difference in opinions as to value reached by the two expert witnesses, at least to the extent it is attributable to the discounted cash-flow approach, is exclusively the result of differences between them as to the values of certain variables." (J.A. at 186.) Thus, the court concluded that Bajaj used the same discounted cash flow methodology as Taxpayers' experts and his decision not to tax affect G&J's earnings was "not a difference as to methodology." (J.A. at 186). The court determined that a challenge to Bajaj's approach to tax affecting was "nonsensical" and declined to apply any of the other factors suggested in *Daubert*, including determining whether Bajaj's method had not been subjected to peer review. (J.A. at 186.)

We disagree with the tax court's characterization of the respective experts' approaches to tax affecting as a mere difference in variables. There was no spectrum of tax percentages from which the court could have selected. Rather, the choice was either a corporate tax rate of 40% or a rate of 0%, the latter meaning no tax affect at all. But while the tax court's analysis was rather cursory, we do not believe that further evaluation was necessary under the circumstances. Taxpayers argue that Bajaj's use of the discounted cash flow analysis without tax affecting is not supported by testing, peer review, publication, or acceptance by the relevant scientific community. To a large extent, Taxpayers' claim that Bajaj's testimony was inadmissible hinges upon the correctness of

their assertions that tax affecting was a generally accepted practice under the discounted cash flow method as of July 31, 1992. In this respect, we believe that Taxpayers' *Daubert* claim is misguided, for they are attacking the correctness of that ultimate valuation more than the reliability of the expert's methods in deriving the value of the shares of stock. The evidence on the record suggested that as of 1992 there was a growing dispute as to the validity of tax affecting the earnings of closely held corporations. In fact, one of Taxpayers' own experts indicated that if charged with the task of valuing the same stock today, he would have to give further consideration to whether he would tax affect the G&J stock. Thus, we do not believe that using a 0% tax affect in calculating the value of stock under a discounted cash flow methodology is scientifically unreliable. For the same reasons we are undeterred by Taxpayers' claim that the use of a 0% tax affect has not been published or submitted for peer review. As the Court recognized in *Daubert*, "in some instances well-grounded but innovative theories will not have been published. . . . Some propositions, moreover, are too particular, too new, or of too limited interest to be published." *Daubert*, 509 U.S. at 593 (citation omitted). "The fact of publication (or lack thereof) in a peer reviewed journal thus will be a relevant, though not dispositive, consideration in assessing the scientific validity of a particular technique or methodology on which an opinion is premised." *Id.*

Although we could imagine challenges to Bajaj's suitability to deliver testimony on what tax affecting approach buyers and sellers would have utilized in 1992, Taxpayers do not assert those claims here. Thus, we believe that further application of the *Daubert* test was unnecessary as to Bajaj's testimony regarding tax affecting, and the court properly admitted Bajaj's expert testimony on this issue. We note, however, that this finding of admissibility bears no relation to the weight to be given this evidence in determining the value of the shares of G&J stock.

appropriate because they demonstrated more accurately than the flawed earlier studies what willing buyers and willing sellers were actually doing in 1992. On appeal, Taxpayers contend that even if the prior studies were indeed flawed, that willing buyers and sellers still relied upon them and they could not have relied on Bajaj's figures because they did not exist as of July 31, 1992. But Taxpayers fail to note that Bajaj repeated his analysis using only pre-valuation date data. This re-analysis resulted in an even smaller lack of marketability discount, which would have been less favorable to Taxpayers. Furthermore, Taxpayers do not reconcile their position with this Court's acknowledgment that subsequent events may be considered if they could be reasonably contemplated on the valuation date. *See Morris v. Commissioner*, 761 F.2d at 1201.

Admittedly, there is a fair amount of conflicting evidence on this issue. But we note that the tax court's determination hinged in large part upon the credence it gave to the testimony of the respective witnesses. Indeed, the court indicated that it found Bajaj's testimony regarding the lack of marketability discount "thorough and more persuasive" than McCoy's. (J.A. at 196.) As the Eighth Circuit recognized, the tax court "does not have to accept 'in toto, in part' or at all" opinions of value provided by experts," *Estate of Ford v. Commissioner*, 53 F.3d 924, 927 (8th Cir. 1995) (quoting *Palmer v. Commissioner*, 839 F.2d 1308, 1310 (8th Cir. 1975)). This holding reiterates the fact that the tax court is in the best position to make factual determinations as to the fair market value of stocks. We cannot conclude that the tax court erred in finding that Bajaj's indicated what a willing buyer and seller would have contemplated on July 31, 1992. Aside from questioning the admissibility of this testimony, a claim which we have already rejected, Taxpayers have done nothing to show that Bajaj's opinion as to the amount of the lack of marketability discount was in error. In this regard, we find that the tax court's application of a 25% lack-of marketability discount was not clearly erroneous.

such that the two family groups could maintain equal ownership.[9]

Taxpayers claim that in arriving at the 35% lack of marketability figure, McCoy relied partly upon studies that have been generally accepted by the appraisal profession and partly upon an intuitive and necessarily subjective weighting of company-specific facts, one of which was that the restrictive agreements signed by the majority shareholders required balanced ownership of G&J stock between the two family groups. But McCoy acknowledged that he had not actually read many of the studies upon which he relied in coming up with the thirty to 50% figure. Rather, he merely relied upon summaries of those studies. McCoy also admitted that the studies showed a wide range of discounts and that several of them showed correlations between certain characteristics of the firms, such as quantity of sales, and the amount of the lack of marketability discount.

In his analysis, Bajaj analyzed the same commonly published studies of lack of marketability discounts that McCoy cited. But Bajaj noted some problems with these studies. He therefore conducted his own independent analysis and, rather than simply applying the average discounts listed in those studies, analyzed G&J specifically to determine the proper lack of marketability discount. Although 79 of the sample transactions used in the study occurred after the valuation date, Bajaj concluded that using post-1992 data was appropriate because there is no reason to believe that the underlying economics would have changed after the valuation date. The tax court found that reliance on such figures was

---

[9] On cross-examination, however, McCoy admitted that the restrictive agreements between the family groups did not contain any limitation requiring balanced ownership. Rather, the Gross/Linnemann and Jarson family groups each had their own agreements restricting the transfer of stock outside of the respective family groups. Although functionally, the force of both agreements would maintain the status quo of each family group owning 50% of the outstanding shares of G&J stock, they did not explicitly require that the 50% balance be maintained.

### 2. Testimony Regarding the Lack of Marketability Discount

Taxpayers also contest the admissibility of Bajaj's testimony indicating that the lack of marketability discount should be 25%. Taxpayers challenge the reliability of what they term the "novel" methodology Bajaj used in calculating this figure and the tax court's failure to fully analyze these methods using the *Daubert* factors. We disagree with Taxpayers' arguments and instead find that the tax court correctly considered statistics relevant to what a reasonable buyer and seller would have considered as of the valuation date. Bajaj's testimony was based upon his own empirical analysis which included a sample of 157 transactions, 79 of which were announced subsequent to the date on which Taxpayers made the transaction at issue. In their motion *in limine* Taxpayers claimed that the data used by Bajaj was unavailable as of the valuation date and that a willing buyer and seller could therefore not have relied upon such data in negotiating a sale price for G&J stock. The tax court rejected this challenge, finding that it is not improper to consider subsequent events that may shed light upon the circumstances that existed as of the valuation date. We have previously held that "subsequent events may only be considered if they were reasonably known on the date of valuation and also that such could be reasonably contemplated on that date." *Morris v. Commissioner*, 761 F.2d 1195, 1201 (6th Cir. 1985) (citing *Estate of Jephson v. Commissioner*, 81 T.C. 999, 1002 (1983) (quoting *Couzens v. Commissioner*, 11 B.T.A. 1040, 1165 (1928)). In *Morris* we held that the tax court did not abuse its discretion in refusing to permit introduction of evidence concerning the state of development on decedent's property eight years after the valuation date. The tax court has interpreted our holding as a rule of relevance. *See Estate of Gilford v. Commissioner*, 88 T.C. 38, 53 (1987).[4] Thus, the

---

[4] The tax court held:

In light of the Sixth Circuit's opinion in *Morris v. Commissioner*, we believe that the rule against

tax court has considered relevant subsequent events that took place less than one year from the valuation date due to its relevance. *See id.* Inasmuch as the 79 post-valuation date transactions used in Bajaj's study could have been anticipated, their inclusion in his empirical analysis does not impede the admissibility of his testimony on this issue. Furthermore, the record indicates that Bajaj repeated his analysis using only pre-valuation date data. This re-analysis resulted in an even smaller lack of marketability discount, which would have been less favorable to Taxpayers. Based upon these facts  we do not believe that Bajaj's opinion regarding the lack of marketability discount was based upon unsound or irrelevant analysis or data. We therefore hold that the tax court did not abuse its discretion in admitting this testimony.

## II.  VALUATION OF THE GIFTS

Taxpayers also contend on appeal that even if Bajaj's testimony was admissible, the tax court's ultimate valuation decision was clearly erroneous. Their argument is based upon a challenge to the use of a 0% tax affect and the use of a 25% lack of marketability discount. Although a majority of the factors the tax court used in calculating the valuation amount were proper, I take issue with the court's use of a 0% tax affect and would therefore hold that to the extent the valuation was based upon the use of a 0% tax affect, the court's ultimate finding that the G&J stock was worth $10,190 per share was clearly erroneous. However, Judge Daughtrey and Judge Cohn disagree with me on this point, so

---

admission of subsequent events is a rule of relevance. Rule 401, Federal Rules of Evidence, applicable in this Court pursuant to Rule 143, Tax Court Rules of Practice and Procedure, and section 7453, defines relevant evidence as "evidence having any tendency to make the existence of any [fact] that is of consequence to the determination of the action more or less probable than it would be without the evidence."

*Estate of Gilford*, 88 T.C. 38, 53-54 (1987) (citation omitted).

---

I must recognize that we are merely determining those factors that hypothetical parties to a sale of G&J stock would have considered as of the gift date. In this regard, I believe that past practices, which the IRS had not deemed to create a deficiency, are demonstrative of the idea that such hypothetical actors would have considered tax affecting G&J stock. This fact in conjunction with the testimony of the experts informs my conclusion that the court's decision to use a 0% tax affect in deriving the value of G&J stock was implausible.

### 2.  Lack of Marketability Discount

With respect to the lack of marketability discount, Taxpayers contend that the court erred in using post-valuation date statistics that a reasonable buyer in 1992 could not have relied upon. We disagree and instead find that the tax court correctly considered statistics relevant to what a reasonable buyer and seller would have done in 1992.

At trial, both sets of experts agreed that because the shares of a closely held S corporation such as G&J are not readily marketable, Taxpayers were entitled to a lack of marketability discount. Taxpayer's expert McCoy cited the lack of marketability discounts listed in three independent studies. Using the average of the lack of marketability discounts in the three studies, he asserted that the "minimum" lack of marketability discount for valuating G&J stock was 30 to 35%. He also listed what he called "risk premiums" and "risk reductions" that were particular to G&J stock to account for this figure. One of these "risk premiums" was the fact that under the shareholders' restrictive agreement, a G&J shareholder could sell his stock to someone outside of the family groups only if he got someone from the other family group to offer the same number of shares to the outside buyer

regulation in *E.W. Bliss*) that specifically approves tax affecting, the agency's regulations are broad enough to permit the practice and definitely do not ban it outright. *See* Rev. Ruling 59-60 (suggesting reliance upon a wide variety of factors in appraising the value of closely held corporations). Moreover, as I have already discussed, the agency's internal directives seem to permit the practice of tax affecting.

Taxpayers also contend that the Commissioner should not have discretion to treat taxpayers in a manifestly unfair and inequitable manner, especially given the fact that the IRS has not adopted uniform rules or regulations banning tax affecting S corporations. Taxpayers cite *Righter v. United States*, 439 F.2d 1204 (Ct. Cl. 1971), which stands for the proposition that the IRS should not treat parties who are similarly situated in a different manner. In that case, the court held that in determining the value of certain stock held by an estate the IRS's valuations of "other estates, involving the same stock" were probative for valuation of the taxpayer's estate. *Righter*, 439 F.2d at 112-13. In the instant case we are not confronted with two different parties, but rather the same parties. But we are dealing with two different tax returns, both of which tax affected G&J stock but only one of which was approved by the Commissioner. Thus, I do not believe that this case presents a situation so different from *Righter* as to require a different result. The Commissioner argues that no general rule of law exists that could permit a taxpayer to avoid paying a tax rightfully due by showing that he had escaped his obligation in the past. This much is true, but a principle of law does require that the IRS establish practices and procedures that are consistent and predictable, not subject to the whim of the Commissioner. *See Estate of Bright v. United States*, 658 F.2d 999, 1006 (5th Cir. 1981) (rejecting the proposed practice of family attribution based upon "the important policy that the law should be stable and predictable" and noting that such a policy "is especially important in the tax laws, because there is widespread reliance by taxpayers upon established tax principles in planning their affairs") (citing *Estate of Hattie L. McNary v. Commissioner of Internal Revenue*, 47 T.C. 467 (1967)).

that our majority holding is that the tax court's use of the 0% tax affect was proper.

### A.

The parties dispute the proper standard of review to be utilized by this Court. Generally, we review the tax court's findings of fact for clear error and its application of law *de novo*. *See Friedman v. Commissioner*, 216 F.3d 537, 541 (6th Cir. 2000); *Ekman v. Commissioner*, 184 F.3d 522, 524 (6th Cir. 1999). The Commissioner contends that the determination of "fair market value" of G&J stock is a question of fact and the tax court's determination may be reversed only if it is clearly erroneous. *See Estate of Newhouse v. Commissioner*, 94 T.C. 193, 217 (1990); *Akers v. Commissioner*, 798 F.2d 894, 897 (6th Cir. 1986) (both holding that determining the value of a gift is an issue of fact and the tax court's factual findings as to fair market value may be reversed only if the determination is clearly erroneous). Yet the question of whether the tax court used the correct standard to determine the fair market value is a legal issue. *See Powers v. Commissioner*, 312 U.S. 259, 260 (1941)*; Razavi v. Commissioner*, 74 F.3d 125, 127 (6th Cir. 1996) (holding that the determination of whether the tax court used the correct standard to measure "fair rental value" is a legal issue); *Ruehlmann v. Commissioner*, 418 F.2d 1302, 1304 (6th Cir. 1969) ( holding that the criterion to be applied in determining value is a matter of law). It is undisputed that for federal gift tax purposes the fair market value is the price at which the stock would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts. *See United States v. Cartwright*, 411 U.S. 546, 551 (1973); *Heyen v. United States,* 945 F.2d 359 (10th Cir. 1991); I.R.C. § 2512. This legal standard has come to be known as the "willing buyer/willing seller" standard. In the case at bar, the tax court clearly cited the correct legal standard (the willing buyer/willing seller standard), which was the same standard advocated by Taxpayers. But Taxpayers allege that the court deviated from

this standard by not "tax affecting" the G&J stock and by considering post-valuation date data. They therefore argue that the proper standard of review is *de novo* because the issue is a mixed question of law and fact. *See Razavi,* 74 F.3d at 127.

We find that this dispute is not over the proper criteria to be used in determining fair market value, but rather over whether those criteria were properly applied. Essentially, Taxpayers are merely arguing that the tax court erred in its final valuation by failing to tax affect G&J's stock and by finding that the lack of marketability discount should be 25%. These contentions do not challenge the actual standard; rather they reflect a difference in opinion as to the methodologies used to arrive at the valuation amount. "The choice of the appropriate valuation methodology for a particular stock is, in itself, a question of fact." *Estate of Newhouse*, 94 T.C. at 245 (citing *O'Malley v. Ames*, 197 F.2d 256, 258 (8th Cir. 1952); *Riss v. Commissioner*, 56 T.C. 388, 430 (1971), *aff'd sub nom. Commissioner v. Transport Mfg. & Equipment Co.*, 478 F.2d 731 (8th Cir. 1973), *aff'd, cause remanded* 478 F.2d 1160 (8th Cir. 1973)). Thus, we will review the tax court's valuation decision only for clear error.

A finding is clearly erroneous when, although there is evidence to support it, a review of the entire record leaves the reviewing court with the definite and firm conviction that a mistake has been made. *See Commissioner v. Duberstein*, 363 U.S. 278, 291 (1959); *Faulconer v. Commissioner*, 748 F.2d 890, 895 (4th Cir.1984). This standard of review requires that we accord great deference to the values established by the tax court, but it does not render us a mere rubber stamp. *See Miami Valley Broad. Corp. v. Commissioner*, 594 F.2d 556, 557 (6th Cir. 1979). This Court can only overturn the tax court's decision if it is "left with a definite and firm conviction that a mistake has been committed." *Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 394095 (1948)). When reviewing for clear error, the court cannot substitute its judgment for that of the

approved 1988 taxes paid by Taxpayers based on gifts of G&J stocks valued at $3,900 per share -- a sum determined by tax affecting G&J stock. Taxpayers assert that the Commissioner's review and approval of these previous returns entitles them to rely upon tax affecting at a later date, claiming that the Commissioner somehow acted "retroactively" to their detriment. In support of this proposition they cite *E.W. Bliss Co. v. United States*, 224 F. Supp. 374 (N.D. Ohio 1963), *aff'd* 351 F.2d 449 (6th Cir. 1965), in which the court held that the Commissioner cannot act retroactively in a particular case where his own regulations are "broad enough to allow a taxpayer's method as one in accordance with generally accepted accounting principles or best accounting practices and one which was consistently followed." *Id.* at 384. In *Bliss*, the court stated:

> [if a taxpayer's] method of valuing its inventory of work in process is substantially in accord with the regulations, great weight must be given to its long record of consistent application of the same method . . . The Government's most vigorous objection to the taxpayer's method of valuing its inventory is to the latter's allowance of a normal margin of profit. The Government asserts that the allowance of a normal profit in evaluating inventories is not recognized by the American Accountants Association or by the Chartered Accountants of England was Wales. Such an allowance, however, is recognized by the Commissioner of Internal Revenue in Regulation 29.22(C)-8 as being applicable to retail merchants and also has the approval of the American Institute of Certified Public Accountants.

*Id.* at 383-84 (emphasis added). I acknowledge that the facts of the instant case do not reflect numerous returns using tax affecting. Nonetheless, I believe that given the amount of time since the 1988 tax returns, the Commissioner's decision not to allow tax affecting in the returns at issue in this case brings Taxpayers within the aegis of *E.W. Bliss*. Furthermore, although in the instant case the Commissioner had not adopted a specific regulation or policy (such as the allowance

If you are comparing a Subchapter S corporation to the stock of similar firms that are publicly traded, the net income of the former must be adjusted for income taxes using the corporate tax rates applicable for each year in question, and certain other items, such as salaries. These adjustments will avoid distortions when applying industry ratios such as price to earnings.

(J.A. at 865.) In rebuttal, the Commissioner argues that these documents were intended for internal IRS use only. This much is evident in the express language included on the cover of IRS Valuation Guide, which warns: "This material was designed specifically by the IRS for training purposes only. Under no circumstances should the contents be used or cited as authority for setting or sustaining a technical position." (J.A. at 862.) Indeed, Taxpayers' own expert, McCoy, acknowledged that these documents were intended solely for the use of IRS employees. But McCoy responded to this argument by asserting that it was irrelevant because in the real world professionals still relied on the manuals and, therefore, their clients did, too. The tax court determined that Taxpayer's did not show that they had actually relied on these internal guidelines and therefore failed to show the type of detrimental reliance that would justify estopping the Commissioner from disregarding the tax affecting methodology. But I do not believe that Taxpayers must show that they actually relied on these materials in preparing their tax returns. Rather, the principles stated in these materials bear evidentiary weight in support of the notion that a willing buyer and seller would have used the same tax affecting approaches stated therein in valuing shares of G&J stock. Although I do not agree with Taxpayers' contention that the IRS is somehow estopped from now disclaiming tax affecting as a recognized practice, I recognize that these documents reflect a certain acceptance of tax affecting as a valid method of valuation.

The notion that willing buyers and sellers would have used tax affecting under the discounted cash flow methodology is further supported by the fact that the IRS had previously

tax court but rather must uphold the tax court's account of the evidence if it is plausible in light of the record viewed in its entirety. *Id.* at 574. "Where there are two permissible views of the evidence, the fact finder's choice between them cannot be clearly erroneous." *Id.* Thus, where the tax court's findings of fact rest upon credibility determinations, the fact finder's choice must be accorded more deference. Moreover, the Commissioner's determination of a tax deficiency is presumptively correct and the taxpayer has the burden of proving that the determination is erroneous or arbitrary. *See Kearns v. Commissioner*, 979 F.2d 1176, 1178 (6th Cir. 1992) (citing *United States v. Janis*, 428 U.S. 433, 440 (1976)); *see also* Tx Ct. R. 142(a).[5]

**B.**

The Internal Revenue Code imposes a tax on the transfer of property by gift. The valuation of a gift of stock is the fair market value on the date the gift was made. *See* I.R.C. § 25.2512-2(a). Fair market value has been defined as the "price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of the relevant facts." Treas. Reg. § 25.2512-1; *see also United States v. Cartwright*, 411 U.S. 546, 551 (1973); *cf. Razavi*, 74 F.3d at 127 (defining the term "fair rental value" in a similar fashion and by reference to the term "fair market value").

Moreover, the IRS's published regulations indicate that "determination of fair market value, being a question of fact, will depend upon the circumstances in each case . . . [and a] sound evaluation . . . [requires] common sense, informed

---

[5]Tax Court Rule 142(a) provides that "[t]he burden of proof shall be upon the petitioner, except as otherwise provided by statute or determined by the Court; and except that, in respect of any new matter, increases in deficiency, and affirmative defenses, pleaded in the answer, it shall be upon the respondent." Tx Ct. R. 142(a); I.R.C. § 7453; *see also Friedman v. Commissioner*, 216 F.3d 537, 542 (6th Cir. 2000).

judgment and reasonableness." Rev. Rul. 59-60 § 3.01, 1959-C.B. 237, 238, *modified by* Rev. Rul. 65-193, 1965-2 C.B. 370.  Section 4 of Revenue Ruling 59-60 provides:

It is advisable to emphasize that in the valuation of the stock of closely held corporations or the stock of corporations where market quotations are either lacking or too scarce to be recognized, all available financial data, as well as all relevant factors affecting the fair market value, should be considered.  The following factors, although not all-inclusive are fundamental and require careful analysis in each case:

(a) The nature of the business and the history of the enterprise from its inception.
(b) The economic outlook in general and the condition and outlook of the specific industry in particular.
(c) The book value of the stock and the financial condition of the business.
(d) The earning capacity of the company.
(e) The dividend-paying capacity.
(f) Whether or not the enterprise has goodwill or other intangible value.
(g) Sales of the stock and the size of the block of stock to be valued.
(h) The market price of stocks of corporations engaged in the same or a similar line of business having their stocks actively traded in a free and open market, either on an exchange or over-the-counter.

Rev. Rul. 59-60 § 4, 1959-1 C.B. 237.

After hearing the evidence on these issues, the tax court found that the fair market value of a share of G&J stock on July 31, 1992 was $10,910.  In so holding, the court noted that valuation is an issue of fact on which Taxpayers' beared the burden of proof.  Taxpayers contend that the tax court lost sight of the willing buyer and willing seller standard.  They assert that the tax court made no attempt to discuss or analyze any of the relevant facts which a hypothetical buyer of a

every circumstance, in both of these cases the tax court did use after-tax earnings in valuing the stock of S corporations.[8]

But perhaps Taxpayers most persuasive argument is that the IRS itself has implicitly endorsed the policy of tax affecting in valuing stock of S corporations.  In support of this claim, Taxpayers point to two internal IRS documents which mention making adjustments for taxes of S corporations. The IRS Valuation Guide for Income, Estate and Gift Taxes: Valuation Training for Appeals Officers states at pages 7-14:

S corporations lend themselves readily to valuation approaches comparable to those used in valuing closely held corporations.  You need only adjust the earnings from the business to reflect estimated corporate income taxes that would have been payable had the Subchapter S election not been made.

(J.A. at 864.)  In addition, the IRS Examination Technique Handbook provides:

---

[8]In addition, these cases noted the imprecise nature of valuing such stocks:

We recognize that the valuation process is not an exact science . . . . [S]ince this unwelcomed onus has been placed on this Court, we have, in the exercise of our 'Solomon-like wisdom,' . . . arrived at our determination of fair market value, as reflected in our ultimate finding of fact, by weighing all of the facts and circumstances contained in the entire record.

*Estate of Hall v. Commissioner*, 34 T.C.M. (CCH) 648, 666 (1975) (citation omitted).

Once again we are asked to determine the value of shares of stock in a closely-held corporation, a science which, to use Winston Churchill's words, usually results in a "gross terminal logical inexactitude".  Determinations of value of closely held stock involve a melding of numerous objective criteria, prior human experience and personal judgment.

*Maris v. Commissioner*, 41 T.C.M. 127, 137 (1980).

earnings and would have to note the fact that G&J's S corporation status was not guaranteed.[7]

Aside from its attempt to distinguish the particular characteristics of G&J, the tax court's opinion focused on its theoretical belief that tax affecting was not an appropriate substitute for certain "difficult to quantify disadvantages" of S corporation status. The court believed that the principle benefit that shareholders of an S corporation expected was reduced taxes and it saw "no reason why that savings ought to be ignored . . . in valuing an S corporation." (J.A. at 192-194.) *Cf. In re Radiology Assocs., Inc. Litig.*, 611 A.2d 485, 495 (Del. Ch. 1991) (holding that ignoring taxes altogether is the only way that the discounted cash flow analysis can reflect accurately the value of a company's cash flows to its investors). I recognize that in making this factual determination, the tax court is not bound by the opinion of any expert witness and may accept or reject that testimony in the exercise of its sound judgment. *See Helverina v. Nat'l Grocery Co.*, 304 U.S. 282, 295 (1938). But I believe that in the instant case the tax court's judgment was less than sound in many respects, for it flies in the face of the evidence on the record.

On appeal Taxpayers assert that tax affecting was an accepted practice because it had been "specifically approved" by the tax court, citing *Maris v. Commissioner*, 41 T.C.M. (CCH) 127, 138 (1980) and *Hall v. Commissioner*, 34 T.C.M. (CCH) 648, 667 (1975). Although not specifically holding that tax affecting was an acceptable approach to valuation in

---

[7]Taxpayers also contended that tax affecting was necessary to compensate for the disadvantages G&J faced as an S corporation in raising capital. But the court dismissed this concern, finding that it was not a proper justification for tax affecting inasmuch as this disadvantage is more appropriately addressed in determining the appropriate "cost of capital." Taxpayers have not attacked this rationale on appeal.

minority interest in G&J stock would be legally presumed to know and act upon with respect to two key variables--the decision whether to tax affect G&J's earnings and the extent of the lack of marketability discount.

## 1.   Tax Affecting[6]

Taxpayers contend that a willing buyer in 1992 would have tax affected the stock by 40% in determining a purchase price. Their main argument in support of this contention is that a hypothetical willing buyer in 1992 would be presumed to know that tax affecting earnings was the generally accepted practice of the business appraisal community in valuing a minority interest in S corporations. The Commissioner argues that tax affecting was not a generally accepted business practice at the time. At trial, both parties presented conflicting evidence on this issue. Bajaj testified to that it would be unreasonable to subtract hypothetical corporate income taxes from G&J's projected future income because the corporation did not, in fact pay any taxes. But Taxpayers largely discredited Bajaj's testimony by pointing out that by his own admission he had no first hand knowledge of what willing buyers did in 1992. In fact, Bajaj testified that he had no first hand knowledge as to what the accepted practice among tax appraisers was in 1992 regarding tax affecting S corporation stock. Conversely, both McCoy and Wilhoite testified on behalf of Taxpayers that tax affecting was the approach generally followed in 1992 by the appraisal community in evaluating S corporations. On cross-examination, McCoy did admit that there was a growing controversy in 1992 as to the propriety of the tax affecting. McCoy also agreed that the matter was still being debated as of the time of trial and that if he had to value stock of the G&J corporation as of that time, he would give further consideration as whether he would use the tax affecting method. But, as Taxpayers note, the fact that there was a

---

[6]The opinion expressed in this section, II.B.1, is solely that of Judge Clay, and not the opinion of the majority.

growing controversy on the issue does not necessarily mean that the method was not generally relied upon in 1992. McCoy averred that despite a sprinkling of articles questioning tax affecting, it was the recognized practice for appraising S corporations at the time. In fact, McCoy testified that although there may have been other approaches to appraising the stock of S corporations, all that he had seen had tax affected.

Taxpayers attempted to justify use of tax affecting by arguing that although an S corporation does not have to pay property taxes, there are costs or trade-offs in electing S corporation status which tax affecting is intended to address. But the court found that as a "theoretical matter" and "as a matter of economic theory," that tax affecting was inappropriate to offset these concerns. In addition the court found, and the Commissioner now argues, that despite Taxpayers' contention that tax affecting was the recognized practice, it would be imprudent to tax affect the stock of an S corporation absent the existence of circumstances indicating that these trade-offs were at play with respect to G&J. One of these trade-offs was that S corporations sacrifice growth opportunities and capital appreciation in exchange for current income. Through the expert testimony of McCoy and Wilhoite, Taxpayers also claimed that S corporation shareholders were at risk that the corporation might not distribute enough of its income to through dividends to cover the shareholders' tax obligations. They argued that tax affecting is appropriate because an S corporation is "committed" to distributing enough income to its shareholders to cover their tax liabilities and this "imbedded cost" must be recognized. The tax court rejected the notion that tax affecting was necessary to offset the possibility that G&J might not distribute enough income to cover its shareholder liabilities. The court noted that the evidence on the record indicated that G&J distributes nearly all of its income to the shareholders and found that this fact, combined with G&J's strong growth record made it unlikely that the corporation would be unable to distribute sufficient income to cover shareholder tax liabilities. But in fact, McCoy testified

and Bajaj seemed to agree that in 1992, G&J had limited growth opportunities for the next several years. (J.A. at 252, 254.) Absent a strong projected growth pattern, the fact that a corporation distributes nearly all of its income to the shareholders does not guarantee that it will distribute dividends sufficient to cover all tax liabilities while leaving a desirable net profit.

McCoy also indicated that tax affecting was necessary in order to protect against the danger that an S corporation might lose its "S" status. But the tax court found that it was illogical to tax affect an S corporation's income without facts or circumstances that established the likelihood that its S corporation status would be lost. In support of this finding the court noted that G&J's majority shareholders had already signed restrictive agreements that would preempt any transfers that would jeopardize G&J's S corporation status and that there was no indication in the record that they planned to terminate this practice. But these agreements were only designed to protect the S corporation status, which the corporation entered into by written agreement, for at least ten years. The restrictive agreements governed only the transfer of stock. Although they were designed to protect the S corporation status, that status could have been shed absent a transfer of shares. Thus, the restrictive agreements were not the final authority. Although there is no indication that G&J sought to immediately shed its S corporation status, the period of agreement was to expire soon after the transactions at issue took place. Even if G&J's shareholders had no immediate plans to alter the company's S corporation status, there was no guarantee that the company would retain this status for a significant time beyond the transaction date at issue in this case. It is this prospective period which concerns buyers and sellers of stock insofar as events occurring during that time period have a bearing on the current sale price. Therefore, a willing buyer and seller anticipating the corporation's future