In re Kenn R. **KRIEGISH**, Debtor.

**Kenn R. Kriegish, Appellant,**

v.

**Richard Lipan, d/b/a Majestic Construction, Appellee.**

**No.  01–CV–10213–BC.**

United States District Court, E.D. Michigan, Northern Division.

April 9, 2002.

Jack A. Weinstein, Saginaw, MI, for Debtor.

Matthew T. Smith, Oade, Stroud, East Lansing, MI, for Appellee.

## *OPINION AND ORDER AFFIRMING JUDGMENT OF BANKRUPTCY COURT*

LAWSON, District Judge.

Appellant, Kenn R. Kriegish, appeals the judgment of the United States Bankruptcy Court determining that $57,534.90 of its debt owed to appellee, Richard Lipan, doing business as Majestic Construction, is nondischargeable because that portion of the debt owed to the appellee resulted from Kriegish's defalcation while acting in a fiduciary capacity. The debt arose in the course of a construction project in which Lipan acted as general contractor and hired Kriegish and his company, Kenn's Sheet Metal Corporation (Kenn's), to serve as the heating, ventilation and air conditioning (HVAC) subcontractor. Kriegish contends that the

Bankruptcy Court erred in finding that Kriegish misappropriated funds paid to him by Lipan which should have been used to pay Kriegish's material suppliers, effectively requiring Lipan to pay those obligations twice. Kriegish also argues that the finding that his conduct violated the Michigan Builders Construction Fund Act (MBCFA), Mich. Comp. Laws § 570.151 *et seq.*, was erroneous. The Court finds that the factual determinations of the Bankruptcy Court are amply supported by evidence in the record, and that the determination that appellant breached his fiduciary duty to appellee created by the MBCFA, rendering the portion of the debt identified by the Bankruptcy Court nondischargeable under 11 U.S.C. § 523(a)(4), was correct as a matter of law. The judgment of the Bankruptcy Court, therefore, will be affirmed.

## I.

Lipan was the general contractor on a construction project known as the Fostrian Manor project. On October 28, 1997, Lipan entered into a construction contract with Kenn's Sheet Metal, Inc. in which the latter agreed to serve as the HVAC subcontractor for the project. The original contract price was $284,083, however Kenn's never completed the job, and Lipan's obligation to pay was reduced accordingly.

The Bankruptcy Court found, and the parties do not dispute, that the appellant-debtor, Kenn Kriegish, was the sole shareholder, director and corporate officer of Kenn's, and was the sole responsible party determining how funds received were applied and who was to be paid. He oversaw the day-to-day financial affairs of the company.

Kenn's in turn contracted with companies known as Thermal Netics, Inc. and Aaon, Inc. to furnish equipment for the project. Thermal Netics issued an invoice for its services to Kenn's in the amount of $29,234.80. On May 19, 1998, Lipan issued a check in the amount of $89,991 payable jointly to Kenn's and Thermal Netics, presumably intending Kenn's to pay its bill to Thermal Netics from those funds. However, Kriegish crossed out the name of Thermal Netics and deposited the full amount of the check into Kenn's bank account and never tendered any of the funds to Thermal Netics. Consequently, Lipan issued another check on July 16, 1998 jointly to Thermal Netics and Kenn's in the amount of the invoice, $29,234.80, which Kriegish endorsed over to Thermal Netics and Lipan tendered to the subcontractor.

Similarly, despite Kenn's agreement to pay Aaon, Inc. for furnishing equipment, Kenn's never tendered payment and Lipan paid that subcontractor directly with two checks totaling $77,018.30 in April, 1998. Kriegish contends that Lipan subsequently agreed to pay Aaon directly in change orders that were signed in August, 1998. Lipan disputes this contention, and points to the fact that he paid Kenn's a total of $182,342.30 (excluding the joint check in the amount of $29,324.80) which Kriegish acknowledges depositing into the company account. That amount exceeded the adjusted contract amount of $204,707.19, according to Lipan, by $6,869.91, and included the amounts that should have been paid to the equipment suppliers. Consequently, Lipan argues, he double-paid Thermal Netics and Aaon.

The appellee, Lipan, contended that Kriegish became a fiduciary with respect to the contract funds Lipan paid over to him on behalf of his company and Kriegish was therefore obliged under the MBCFA to distribute those funds to the intended beneficiaries, that is, subcontractors and materialmen, before applying any of those funds to his own use. His failure to pay

the equipment suppliers from that fund constituted a breach of that trust requiring an accounting and, ultimately, a finding that the failure of Kriegish to reimburse Lipan for the double payment to Thermal Netics and Aaon created a "debt ... for ... defalcation while acting in a fiduciary capacity" which may not be discharged under 11 U.S.C. § 523(a)(4).

The Bankruptcy Court agreed. In his written opinion, Judge Spector concluded:

> In this case, the Plaintiff, as general contractor, showed that it paid statutory beneficiaries and thereby obtained their rights to insist on an accounting. The only two statutory beneficiaries identified are Aaon, and Thermal Netics. The evidence shows that the money which paid Aaon and Thermal Netics came from the Plaintiff's bank account. The Defendant argues, however, that the evidence also shows that these payments were deducted from the amounts which the Plaintiff owed to the Defendant. *See* Plaintiff's Exhibit 5, pages 26, 28; Defendant's Exhibit Q; Plaintiff's Exhibit 1 (specifically Change Orders # 4 and # 5). Therefore, he paid the bills by means of setoff.
>
> If that were all there was, the Defendant's argument would end the matter. But the Plaintiff showed that the $29,234.80 portion due to Thermal Netics' represented in the larger joint check # 014281 (Plaintiff's Exhibit # 21 (top)) never got to the intended payee, Thermal–Netics. It is undisputed that all of the $89,991 in that check was deposited in the Corporation's bank account. So, Plaintiff had to, and did, via check # 014485 (Plaintiff's Exhibit 21(bottom)), pay Thermal Netics a second time on July 16, 1998.
>
> Plaintiff's Exhibit 1 (specifically Change Orders # 4 and # 5) showed that the parties agreed that Aaon would be paid by the Plaintiff, but that the payment would reduce the amount the Plaintiff would then pay the Defendant, resulting in the Defendant being the one who ultimately "pays" the bill. But, the Plaintiff showed that those change orders, which are dated in August, 1998, arose only after he had, in April, 1998, already paid the Defendant for the Aaon invoices. *See* Plaintiff's Exhibit 7, pages 5 and 7, and Plaintiff's Exhibit 27. So, when the Plaintiff ultimately did pay Aaon on the two invoices a total of $77,018.30 (*see* Plaintiff's Exhibit 20), he, in effect, double-paid the Aaon bill (once through the Defendant, who never paid Aaon and once directly to Aaon).
>
> Thus, the Plaintiff has shown that, by paying the Defendant's materialmen, Aaon and Thermal–Netics, he subrogated to their rights as statutory beneficiaries. Therefore, the Plaintiff is due an accounting from the Defendant of what he did with the $182,342.30 he received for his part of the Project. *See* [*In re Little*, 163 B.R. 497 (Bankr.E.D.Mich. 1994)]. The burden was on the Defendant to prove that all of the funds he received on the Project were properly expended. *Id.*
>
> The Defendant had no ledger for the Project, the one best piece of evidence to prove his defense. The Defendant's accounting exhibits, especially Exhibit G, lacked credibility. Several times, and for significant amounts, it was demonstrated that the exhibits were overgenerous in accounting for expenses related to the Project. Using a one-third allocation—that is, one third of all employees' time was spent on the Project as opposed to all other work the Corporation performed during the relevant time period—the Court finds that the Defendant properly accounted for $124,807.40 of the trust funds received by the Corporation. *See* Defendant's Exhibits C, D, parts of G (all items but for check num-

bers 1054, 1056, 1117, 1260, 1276, 1299, 1438, 1447, 1596, 1168, 1079, and 1290), Z and AA.... Concomitantly, the Court finds that the Defendant did not account for $57,534.90 of the trust funds. General operating expenses of the Corporation may not be paid out of trust funds. Defendant's Exhibits F, H, I, J, the MESC unemployment taxes portion of Exhibit Z, and the sales and use tax portion of Exhibit E catalog the type of expenses which may not be paid from trust funds, even if they are prorated to the Project....

The expenses excepted from Defendant's Exhibit G could not be linked up by the Defendant to the Project. Therefore, if the Defendant actually caused the Corporation to pay these expenses from the trust funds, it was a misappropriation. Regardless of whether the payments came from trust funds, though, since these expenses are not attributable to the Project, the Defendant gets no credit for their payment in his effort to show that all trust funds were used to pay the Project's statutory beneficiaries.

While the Defendant also showed that he underbid the contract by $60,000, (perhaps coincidentally but perhaps not, about the amount for which he was unable to properly account) and that there were multiple changes made to the contract, these points are relevant to a breach of contract case, not a fiduciary defalcation case, such as this. If the Plaintiff paid the Corporation money for work done on the Project, and the funds were all used by the Corporation in payment of the Project's statutory beneficiaries, it matters not at all that the Corporation breached its contract by not completing the job. On the other hand, if the Corporation spent funds it received in relation to the Project for non-statutory purposes, it violated the Act

whether or not it underbid the contract or the contract was changed mid-course. The Court finds that the Corporation used $57,534.90 of the trust funds for its own corporate purposes and that this misappropriation damaged the Plaintiff by requiring it to pay the statutory beneficiaries himself.

The Bankruptcy Court concluded that the appellee thus was entitled to a judgment determining $57,534.90 of his claim against the appellant to be excepted from discharge pursuant to 11 U.S.C. § 523(a)(4), and also awarded the appellee statutory costs. In a brief note at the end of the opinion, the Court noted that the appellee had alleged that his entire claim should be excepted from discharge on account of the appellee's fraud. 11 U.S.C. § 523(a)(2). The Bankruptcy Court rejected that claim, stating that it found "no evidence tending to show that the Defendant intended to deceive the Plaintiff," and dismissed that count of the complaint. Opinion at 8–9.

## II.

In bankruptcy proceedings, the bankruptcy judge is the finder of fact. *In re Isaacman,* 26 F.3d 629, 631 (6th Cir. 1994). Accordingly, those findings will not be disturbed unless they are clearly erroneous, and the appellant can demonstrate "the most cogent evidence of a mistake of justice." *In re Baker & Getty Fin. Servs.,* 106 F.3d 1255, 1259 (6th Cir.1997). Conclusions of law are reviewed de novo. *In re Zaptocky,* 250 F.3d 1020, 1023 (6th Cir. 2001).

### A.

The appellant first attacks the Bankruptcy Court's conclusion that Lipan made double payments to the materialmen. It is not the function of this Court to revisit every factual determination made

by the bankruptcy court. This Court reviews the bankruptcy court's factual findings deferentially under the "clearly erroneous" standard. Thus, if the lower court has offered a plausible view of the evidence, this Court must defer to the bankruptcy court's findings, even if the appellant offers another, perfectly reasonable interpretation. *See Gross v. Commissioner*, 272 F.3d 333, 343 (6th Cir.2001) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 394–95, 68 S.Ct. 525, 92 L.Ed. 746 (1948) ("Where there are two permissible views of the evidence, the fact finder's choice between them cannot be clearly erroneous.")).

Here, the bankruptcy court's findings are quite plausible. The court found that the appellee had been forced to "pay for" the services of Thermal–Netics and Aaon twice. For Thermal–Netics, the appellee first included the $29,324.80 payment for Thermal–Netics in an $89,991 joint check, number # 014281. After the appellant did not remit any of the monies to Thermal–Netics, an undisputed fact, the appellee was forced to cut a second check to Thermal Netics for the missing $29,324.80. *See* Findings of Fact and Conclusions of Law at 5; Appellee's Trial Exhibit 21. With respect to Aaon, the bankruptcy court found that the appellee had paid the appellant for Aaon's work in April 1998, but again had to pay Aaon separately in August. *See* Findings of Fact and Conclusions of Law at 5–6. The appellant correctly notes that the August payment was to be deducted from other payments made to the appellee, but fails to account for the initial Aaon payment that disappeared into the company's coffers. The appellant's argument that there was no "meeting of the minds" as to whether the original payments were in fact intended to go to the subcontractors presents an interesting interpretation of the facts, but does not alter the ultimate finding that the appellee ended up making two payments to each subcontractor when it should have only made one through the appellant. The appellant's "meeting of the minds" argument is also hotly contested by the appellee in this case. *See, e.g.*, Pl.'s Br. at 8. The bankruptcy judge was well within his discretion to believe the appellee over the appellant.

The bankruptcy court's finding of double-payments to Thermal Netics and Aaon was not clearly erroneous, and therefore is affirmed.

#### B.

The appellant next argues that the MBCFA does not apply to the transactions in this case. He contends that, first, the MBCFA does not impose a constructive trust upon each draw but upon the total monies paid by a contractor to a subcontractor, and requires that the beneficiaries must not have been paid by the subcontractor first. Second, the MBCFA treats all beneficiaries equally, with no priority given to any particular beneficiary. Lipan's theory of double-payment favors one beneficiary over another, namely subcontractors over the Kenn's own employees, and is impermissible. Third, the facts at issue here concern contract law, not a violation of the MBCFA. Excess payments were approved by Lipan before paying Aaon, making the extra funds a loan, not part of a trust. Fourth, the MBCFA does not confer standing upon the appellee, says Kriegish, because the appellee never had to pay for or defend against any construction liens or lawsuits. Once Lipan paid the two subcontractors, Kenn's obligation was at an end.

Kriegish further contends that even if his company's conduct did violate the MBCFA, it was not required to do an accounting for Lipan's benefit. Once all beneficiaries have been paid, there is no need to account under the MBCFA. Also, he argues that Judge Spector's decision in

*In re Little,* 163 B.R. 497 (Bankr. E.D.Mich.1994), which he relied upon in this case, improperly shifts the burden of proof to the trustee to disprove defalcation rather than to the appellee to demonstrate it.

█ The Court does not accept the appellant's interpretation of the MBCFA or his view of its interplay with the provisions of the Bankruptcy Code. Title 11 of the United States Code provides that no debt shall be dischargeable in bankruptcy that was incurred by "defalcation while acting in a fiduciary capacity." 11 U.S.C. § 523(a)(4). The MBCFA states in relevant part:

> In the building construction industry, the building contract fund paid by any person to a contractor, or by such person or contractor to a subcontractor, shall be considered by this act to be a trust fund, for the benefit of the person making the payment, contractors, laborers, subcontractors or materialmen, and the contractor or subcontractor shall be considered the trustee of all funds so paid to him for building construction purposes.

Mich. Comp. Laws § 570.151. The builders' trust fund act was originally passed during the Great Depression as a means to provide additional protection to subcontractors and materialmen. *DiPonio Constr. Co. v. Rosati Masonry Co.,* 246 Mich.App. 43, 49, 631 N.W.2d 59, 63 (2001). The act targeted the practice of pyramiding funds among successive construction projects, which hindered the ability of unpaid subcontractors to utilize mechanic's liens and other traditional remedies. *See id.* Because the MBCFA is remedial in nature, it is construed liberally for the advancement of its remedy. *Id.* at 50, 631 N.W.2d at 63.

█ Upon receiving funds for a construction project, the contractor (or subcontractor) becomes a trustee for the project, with the trust assets being distinct from the contractor's corporate assets for bankruptcy purposes. *Weathervane Window, Inc. v. White Lake Constr. Co.,* 192 Mich.App. 316, 325, 480 N.W.2d 337, 341 (1991). "The statute imposes a duty upon the trustee to use the money in the building contract fund to first pay laborers, subcontractors and materialmen on the particular project for which the funds were deposited before he uses the fund for any other purpose." *Huizinga v. United States,* 68 F.3d 139, 144 (6th Cir.1995) (citation omitted). Until an individual makes a payment into the project fund, the liability between contractor and suppliers is solely based on contract. Once the MBCFA is triggered by payment into a fund, however, "the statute prohibits the contractor or subcontractor's use of monies received for a particular project for anything other than first paying laborers and suppliers on that project." *Id.* While it is permissible to use monies from the builder's contract fund to pay employment taxes in some instances, the fund cannot be used to pay taxes on wages paid for other projects. *Sellars v. United States,* 938 F.Supp. 432, 434 (E.D.Mich.1996). The builder's obligation is that of a fiduciary duty to exercise proper and honest judgment. *Weathervane,* 192 Mich.App. at 325, 480 N.W.2d at 341.

In the case of *In re Little,* 163 B.R. 497 (Bankr.E.D.Mich.1994), Judge Spector addressed the effect of the MBCFA upon the dischargeability of debts in bankruptcy proceedings. After first concluding that the MBCFA incorporates the common law of trusts, Judge Spector found that the majority rule appears to be that a trustee can be compelled to provide an accounting, but only if a beneficiary first demonstrates a fiduciary relationship and provides prima facie evidence of mismanagement. *Id.* at 500 (citing 76 Am.Jur.2d *Trusts* § 688). Judge Spector found Michigan law to be

even more stringent, placing the burden of proof entirely upon the trustee to prove proper administration of the trust. *Id.* Accordingly, when a builder trustee files for bankruptcy, he has the burden of demonstrating that he properly managed all funds for the projects undertaken. *See id.* at 503. If he cannot do so, then he is guilty of defalcation, and the trust fund amounts are non-dischargeable under 11 U.S.C. § 523(a)(4). *See Little*, 163 B.R. at 503 ("Thus, it is more accurate to say that the mere failure to account establishes loss.")

In this case, aside from his objections to the idea that the appellee "double-paid" the two subcontractors, the appellant does not specifically dispute the lower court's finding that a significant portion of project funds were spent on non-project expenses, nor does the appellant challenge the lower court's decision to use a one-third allocation factor to approximate an amount of damages for the appellee. Finally, the appellant does not contest that a violation of the MBCFA is a non-dischargeable obligation under 11 U.S.C. § 523(a)(4).

■ For reasons set forth in detail below, this Court accepts and adopts the analysis of the Bankruptcy Court in *Little.* Under the standard applied in that case, the beneficiary need not demonstrate financial irregularities at all. Instead, the beneficiary need only prove the existence of a fiduciary relationship, and then demand an accounting. *See Little*, 163 B.R. at 500. That burden was easily met in this case. The appellee demonstrated a fiduciary relationship as the "person making the payment" of the project funds, and the appellant conceded at trial that he could not account for almost $64,000 of project funds. The lower court found the appellant's attempts at an accounting to be woefully inadequate. Accordingly, the appellant is presumed guilty of defalcation, and the bankruptcy court had the equitable

powers to determine an allocation factor that would approximate the amount of funds misspent. *See In re Croton River Club, Inc.*, 52 F.3d 41, 45 (2d Cir.1995) (bankruptcy courts have broad equitable powers to impose a fair allocation of debt between parties).

The appellant raises a series of objections to this holding. First, the appellant cites to *Renshaw v. Samuels*, 117 Mich. App. 649, 324 N.W.2d 117, 122 (1982), for the proposition that the trust established by the MBCFA applies to "all money" paid by any person to a subcontractor, and argues that the appellee's argument depends upon a trust applicable to each payment rather than to the entire fund. Because the subcontractors eventually were paid, appellant argues, there is no trust problem. This argument must be rejected out of hand. The appellee argued and the lower court found that a trust was impressed over the entire trust res and defalcation was proven by the inability of the appellant to provide a proper accounting for it.

■ Second, the appellant argues that the appellee's invocation of the MBCFA requires the trustee to favor one beneficiary over another, specifically particular subcontractors over other parties entitled to funds, such as the appellant's own employees. The preference of "beneficiaries," however, does not originate from the appellee's theoretical arguments. Rather, it is derived from the plain language of the MBCFA. The holder of a construction trust fund must pay all laborers and subcontractors before using the funds for its own purposes, including payment of its own employees. *See Huizinga*, 68 F.3d at 144. Furthermore, the appellee did not limit his charges of irregularities to questions of laborers vs. other contractors, but also argued, and the bankruptcy court found, that the appellant had used the

funds for a variety of purposes that had nothing to do with the project for which the fund was established. These findings were amply supported by record evidence.

Third, the appellant argues that any dispute over whether the appellant was supposed to pay Aaon and Thermal Netics from payments originally made to the appellant is an issue of contract law, not trust law. It is true that this matter *would have been* a pure issue of contract law absent the MBCFA. However the MBCFA was enacted because other remedies were found by the Michigan Legislature to be inadequate. *See DiPonio,* 246 Mich.App. at 49, 631 N.W.2d at 63 (2001). Hence, the matter is grounded in trust law as well.

■ Fourth, citing to *National Bank of Detroit v. Eames & Brown,* 396 Mich. 611, 242 N.W.2d 412 (1976), the appellant argues that the appellee has no standing under the statute because the subcontractors have all been paid. That case, however, discussed the rights of a secured creditor to leftovers from a building contract fund. The Court ruled that the bank in question, which was not a statutory beneficiary of the trust, could not execute upon the accounts receivable of the contractor holding the trust unless it could first prove that all of the statutory beneficiaries had been fully compensated. In this case, the appellee is a protected beneficiary under the statute because he is both a "contractor" and a "person making the payment" which established the fund. *See* Mich. Comp. Laws § 570.151; *DiPonio,* 246 Mich.App. at 49, 631 N.W.2d at 63 (noting statute is to be construed liberally). Further, the appellant fails adequately to respond to the bankruptcy court's finding that the appellee was subrogated to the materialmen's interests by paying off the appellant's obligation to Thermal Natics and Aaon. Although the lower court did not cite any Michigan law on this issue,

decisional law does in fact support this finding. Michigan recognizes the principle of equitable subrogation:

> Equitable subrogation is a legal fiction through which a person who pays a debt for which another is primarily responsible is substituted or subrogated to all the rights and remedies of the other. It is well-established that the subrogee acquires no greater rights than those possessed by the subrogor, and that the subrogee may not be a "mere volunteer."

*Hartford Acc. & Indem. Co. v. Used Car Factory, Inc.,* 461 Mich. 210, 215, 600 N.W.2d 630, 632 (1999). The requirement that the subrogee not be a "volunteer" ensures that "the damage must have been incurred as a consequence of the third party's fulfillment of a legal or equitable duty the third party owed to the client." *Id.* at 216, 600 N.W.2d at 633. In this case, the appellee was forced to pay Thermal Netics and Aaon on behalf of Kenn's after that company refused to do so. This excess payment damaged the appellee, and thus the appellee was not a mere volunteer. *See id.* Finally, the Michigan Supreme Court has implicitly approved the principle of subrogation in the builder's contract fund context. *See State v. United Pac. Ins. Co.,* 52 Mich.App. 157, 216 N.W.2d 469 (1974). In that case, the Court actually prevented the surety of a contractor from claiming building contract funds held by the State of Michigan on the ground that unpaid subcontractors still had priority. However, the Court did find that the surety fully succeeded to the rights of the principal; the problem was not the subrogation, but that the original contractor's rights did not extend to priority over unpaid subcontractors. *See id.* at 159–60, 216 N.W.2d at 470. Thus, the bankruptcy court's finding that equitable subrogation was appropriate in the context of the MBCFA was proper. Consequent-

ly, the appellee had standing to demand an accounting.

Next, the appellant cites *In re Imperial Tile & Carpet, Inc.,* 94 B.R. 97 (Bankr. W.D.Mich.1988), claiming that the case stands for the proposition that once the subcontractors have been paid, Lipan has no further cause of action. The Court has scrutinized that decision and is unable to find any language anywhere in the opinion that remotely resembles the appellant's gloss.

### C.

■ Finally, the appellant claims that Judge Spector's decision in *Little,* placing the burden of proof on the trustee, is contrary to Michigan case law. This argument is immaterial, inasmuch as the appellee did not rely on *Little's* presumption of misconduct; rather, Lipan affirmatively demonstrated a series of financial irregularities at trial, including tens of thousands of dollars of unaccounted funds and wrongful diverted expenditures. The lower court found in the appellee's favor on these factual determinations, and overwhelming evidence in the record demonstrates that this holding was not clearly erroneous. Thus, even if the lower court would have first required the appellee to demonstrate a prima facie case of financial mismanagement, the appellee would have amply met the burden, and the error, if any, is harmless.

As noted above, however, the Court finds that the bankruptcy court's determination of the burden of proof was proper. The *Little* decision cites a litany of Michigan case law suggesting that the true burden of an accounting rests with the trustee. *See Little,* 163 B.R. at 500–01. Although the *Little* court recognized that the case of *James Lumber Co. v. J & S Construction,* 107 Mich.App. 793, 309 N.W.2d 925 (1981), could be read to suggest a contrary view, *Little* held that the Michigan Supreme Court would not have

so ruled had the case been before it. Another court in this district has also compared *Little* and *James Lumber,* finding that *Little* more accurately reflected Michigan case law. *See In re Hickey,* No. 98–75590, 1999 WL 33313133, at *5, 1999 U.S. Dist. Lexis 15930, at *12–13 (E.D.Mich. Sept.30, 1999) (Hood, J.).

This Court likewise finds the reasoning in *Little* more persuasive. *James Lumber* is an extremely short opinion that fails to consider the impact of trust law on the MBCFA; in cursory fashion, it dismisses the plaintiff's claim without any explanation for its reliance on case law discussing undue influence and fraud instead of trust law. Because the series of cases relied upon by the *Little* court stem primarily from the Michigan Supreme Court, this Court is persuaded that *Little* better represents the view of the state's highest court.

### III.

■ The bankruptcy court's findings of fact are not clearly erroneous, and the appellant has failed to provide any "cogent evidence of [a] mistake of justice." *Baker & Getty,* 106 F.3d at 1259. Judge Spector correctly applied Michigan law to the facts he found, and properly determined the appellant's obligation to be the result of defalcation, thus rendering it non-dischargeable under the bankruptcy code. *See* 11 U.S.C. § 523(a)(4).

Accordingly, it is **ORDERED** that judgment of the Bankruptcy Court is **AFFIRMED.**